**Antoine SMITH, Plaintiff,**

v.

**STANDARD FRUIT & STEAMSHIP CO.,**
**Inc., Defendant.**

**No. 66–Civ. 410.**

United States District Court

S. D. New York.

Dec. 15, 1967.

Harry H. Lipsig, New York City, for plaintiff, by, Jack Steinman, New York City, of counsel.

McHugh & Leonard, New York City, for defendant, by, James M. Leonard, New York City, of counsel.

MEMORANDUM

CROAKE, District Judge.

Plaintiff Antoine Smith is a longshoreman who was injured while unloading bananas at Pier 13 on the East River in New York. Defendant Standard Fruit and Steamship Co., Inc., Smith's employer, has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on the ground that no triable issue of fact exists.

On November 12, 1964, the M/S BRUNSGARD arrived at Pier 13 from South America loaded with bananas and Smith was part of the crew hired to unload her. The unloading was done with the aid of a series of interconnected conveyors. The bananas were first placed by hand on permanent conveyors inside the ship. They traveled to and then along a set of temporary conveyors that connected the ship with a second set of permanent conveyors affixed to Pier 13. The bananas then traveled across Pier 13 to a second set of temporary conveyors which in turn passed them onto a barge moored on the opposite side of the pier from the BRUNSGARD. The barge was also equipped with a permanent conveyor system which redistributed the bananas in the barge preparatory to their journey to Weehawken, New Jersey. Smith was working on the barge, New York Central CARFLOAT #1, when he slipped and caught his arm in the machinery of the barge's conveyor system.

This factual picture must be superimposed upon the somewhat bizarre legal background of longshoremen's personal injury actions before the present problem can be spelled out. In 1927, Congress passed the Longshoremen's and Harborworkers' Compensation Act[1] in an effort to aid those men who performed difficult and often dangerous work in the nation's ports. The Act provided for

1. 44 Stat. 1424, 33 U.S.C.A. § 901 et seq.

a basic scheme of prompt payment of medical and certain other expenses of an injury without regard to fault. In exchange for this guarantee of prompt and full payment, the employees lost their right to sue and collect damages from an employer whose negligence had caused an injury. This was codified in the so-called exclusive remedy clause of the Act, 33 U.S.C.A. § 905, which provides in pertinent part:

> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, * * *.

A longshoreman's employer is a stevedore, a professional unloader of ships who usually works on all kinds of ships on a contract basis. In 1946, the Supreme Court interpreted the exclusive remedy clause as foreclosing lawsuits only against the stevedore-employers, not against the shipowners who had contracted with them to unload the ships. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Thus, if a longshoreman could show that his injury was the result of a shipowner's negligence, i. e., that the ship was unseaworthy, he could collect from the shipowner.

Some shipowners do their own stevedoring and some stevedoring companies own ships. It was inevitable, therefore, that a case would arise posing the question of whether the exclusive remedy clause would foreclose a longshoreman's suit against a shipowner if the shipowner also happened to be his employer. In Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), the Supreme Court held that such suit was not foreclosed.

In the present suit, then, if it can be shown that Standard Fruit was the owner of CARFLOAT #1, it would be subject to suit even though it was also Smith's employer. Standard contends that it was not the owner of CARFLOAT #1, that it was rather the lessee of that vessel, that this is clear on the face of the rental contract between Standard

and the New York Central, and that therefore summary judgment should be granted.

"Ownership" as a legal concept has chameleonesque qualities, taking on shades of meaning according to the commercial-legal setting in which it appears. That in this instance ownership encompasses something more than "legal title" is clear from the Supreme Court's discussion in Reed v. The Yaka, supra, at nn. 5–9, 373 U.S. pp. 412–413, 83 S.Ct. 1349. How much more and/or what kind more are the questions facing the court in the present case. We must decide whether to fit the present relationship between Standard, New York Central, and CARFLOAT #1 into that category of "ownership" which would render Standard subject to suit.

Although on the surface this seems to be purely a question of law, appearances are deceiving. In making a decision as to whether or not a particular relationship shall be included in the definition of ownership, a primary consideration is what will best effectuate the policies of the Longshoremen's and Harborworkers' Compensation Act. Such a decision necessarily turns on the broadest of factual considerations concerning the Act's purposes and the changing context in which those purposes are to be achieved. Not all of these are facts which can be judicially noticed. Indeed, until a hearing is begun it may not be clear precisely what facts are and are not material. It is therefore too early to say that there is no genuine issue as to any material fact in this case, as is required by Rule 56 before summary judgment can be granted. The question as to ownership will be better decided after a full airing of it by both sides.

There is another reason for denying summary judgment in this case. Smith's allegation is basically that CARFLOAT #1 was unseaworthy because of certain deck conditions. In light of the Supreme Court's decision in Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed. 297; rehearing denied,

374 U.S. 858, 83 S.Ct. 1863, 10 L.Ed.2d 1082 (1963), it would not be beyond the realm of possibility for the BRUNS-GARD to be found unseaworthy because of conditions on the deck of CARFLOAT #1. As with "ownership," arriving at a suitable operational definition of "unseaworthy" may turn on facts that are better presented and considered at a later stage in the proceedings.

Motion denied.