**CORPORATE TELECOM SERVICES, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 94–1275.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1995.

Decided June 2, 1995.

Michael J. Hirrel, Washington, DC, argued the cause and filed the briefs for appellant.

Stewart A. Block, Counsel, F.C.C., Washington, DC, argued the cause for appellee. With him on the brief were William E. Kennard, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, DC. John E. Ingle, Deputy Associate Gen. Counsel, and Roberta L. Cook, Counsel, F.C.C., Washington, DC, entered appearances.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In each market area for cellular radio systems, the Federal Communications Commission grants two licenses, one to a telephone ("wireline") company and one to another ("nonwireline") company. When there are competing applicants for a given license, the Commission chooses the licensee by lottery. See 47 CFR § 22 (1994); *Moving Phones Partnership L.P. v. FCC*, 998 F.2d 1051, 1053–54 (D.C.Cir.1993). Appellant, Corporate Telecom Services, Inc. ("CTSI"), won the lottery for the nonwireline license in the Boone, Nebraska Rural Service Area. The FCC nevertheless refused to grant CTSI the license, finding that, because of one Frank Trumbower's interests in CTSI and another applicant, CTSI's application violated the Commission's cross-ownership rule for cellular phone license applications. That rule bars any person from having "an ownership interest, direct or indirect, in mutually exclusive applications filed by publicly-traded corporations," with an exception for interests under 5%. 47 CFR § 22.921(c).

CTSI now appeals, asserting that Trumbower did not, under any reasonable interpretation of § 22.921(c), have an ownership interest of 5% or more in the CTSI application and that the agency's rejection of the application was therefore arbitrary and capricious. See 5 U.S.C. § 706(2)(A) (1988). We find that the FCC has failed to show how its interpretation of the term "ownership" in § 22.921(c)—and its rejection of CTSI's application pursuant to that interpretation— serves the provision's stated purpose. We remand to the Commission so that it may consider this question and if possible supply the reasoned explanation necessary to support its conclusion.

\* \* \*

The facts are not in dispute. Among those who submitted an application for the Boone area nonwireline license were CTSI, a wholly owned subsidiary of SSE Telecom ("SSE"),

and First Cellular Limited Partnership ("First Cellular"). Both SSE and First Cellular are publicly traded companies.

When CTSI filed its application, Trumbower held a 4% interest in SSE (CTSI's parent) as well as a 33% interest in First Cellular. Under the FCC's ownership attribution rules for this licensing program, Trumbower's interest in SSE gave him an equivalent (i.e., 4%) interest in CTSI. See 47 CFR § 22.921(c)(2)(ii); see also *Amendment of the Commission's Rules for Rural Cellular Service*, 4 F.C.C.R. 2440, 2443 ¶ 25 (1988). Thus, Trumbower had an "ownership interest, direct or indirect, in [two] mutually exclusive applications filed by publicly-traded corporations", CTSI's and First Cellular's. Still, both applications were clearly acceptable under the rule, because Trumbower's interest in CTSI fell within § 22.921(c)'s exception for interests of less than 5%.

Complications arose after the applications were filed but before the lottery winner was selected, when SSE decided to raise additional capital through a private placement of stock. Among the potential investors in the issue was Trumbower, who expressed interest in purchasing stock in an amount that would increase his stake in SSE from 4% to approximately 16%. SSE was keen on selling stock to Trumbower, but there was an obvious hitch: If the transaction went through, CTSI's application would be attributed to Trumbower to the extent of his projected 16% interest in SSE; this interest, combined with Trumbower's continued 33% interest in First Cellular, would clearly violate § 22.921(c); and the FCC would surely dismiss both CTSI's and First Cellular's pending applications.

In an attempt to avoid this result, SSE placed all of its stock in CTSI in a stock trust, naming SSE's then-current shareholders as the beneficiaries in proportion to their interests in SSE. As a then–4% shareholder of SSE, Trumbower became the owner of a 4% beneficial interest in the CTSI trust. Although his 4% interest was equitable not legal, no one doubts that it must be attributed to him under § 22.921(c).

Only after spinning off its interest in CTSI to SSE shareholders did SSE go through with the private placement of SSE stock. Trumbower then purchased an additional 12% interest in SSE, as planned, bringing his cumulative total in SSE to 16%. On its face the purchase appeared to bring him no additional interest in CTSI, since SSE itself now held *no* interest in CTSI and had *never* had any interest in the CTSI trust.

Nevertheless, the FCC's Mobile Services Division rejected CTSI's application as defective, the Common Carrier Bureau denied CTSI's request for reconsideration of that decision, and the FCC denied CTSI's petition for review. *Corporate Telecom Services, Inc.*, 9 F.C.C.R. 1012 (1994) ("*Corp. Telecom*"). The FCC explained that, despite the trust arrangement, Trumbower's 16% interest in SSE gave him a 16% indirect "ownership interest" in CTSI's application; the trust arrangement was inadequate to divorce SSE from CTSI because the trustee, Wilbur Pritchard, "was also SSE's largest single shareholder (48 percent), its chief operating officer, and the chairman of its board of directors". *Id.* at 1013 ¶ 10. As such, Pritchard did not "possess[ ] the independence demanded in these situations". *Id.* Moreover, CTSI had shown no "good cause" for a waiver, because CTSI could easily have avoided the violation "by either selecting a disinterested third party as trustee or by Trumbower's divesting himself of his interest in First Cellular." *Id.* at ¶ 11.

In sum, the FCC's position as we understand it is that Trumbower indirectly "owns" a 16% interest in CTSI's Boone application simply because the trustee holding title to CTSI's stock is a large shareholder and director of another company, SSE, in which Trumbower has a 16% interest.

CTSI urges us to reject this position as arbitrary and capricious, arguing in the first instance that the Commission's expansive interpretation of the words "ownership interest, direct or indirect" in § 22.921(c) is not entitled to any deference, because it is contrary to those terms' meaning at common law. See *Jicarilla Apache Tribe v. FERC*, 578 F.2d 289, 292–93 (10th Cir.1978) (where agency bases its interpretation of its rule not on "expertise in the particular field, . . . but

... on general common law principles, great deference is not required."). But while the FCC's final order claims to rest on the ground that the CTSI trust violated "fundamental trust principles", *Corp. Telecom,* 9 F.C.C.R. at 1013 ¶ 8, the FCC shifted ground on appeal; the Commission now abjures any claim that Pritchard's simultaneous interest in SSE makes the trust invalid under common law principles or that Trumbower through SSE has an "ownership interest, direct or indirect" in CTSI's application cognizable under common law. Rather, the Commission maintains that the term "ownership" admits of more than one definition and that it is entitled to adopt a sweeping one when interpreting its own rule. See *Udall v. Tallman,* 380 U.S. 1, 4, 16, 18, 85 S.Ct. 792, 795, 801, 802, 13 L.Ed.2d 616 (1965) (agency's construction of its own regulation is entitled to "great deference" and must be respected if it is "not unreasonable, if the language [at issue] bears [the agency's] construction").

We have no difficulty accepting the proposition that the term "ownership" may vary in meaning depending on the context in which it is used, and that, in some circumstances and for some purposes, the sort of control or influence that Trumbower might have enjoyed through influence over Pritchard might be enough to justify the Commission in disregarding the trust. See *Smith v. Standard Fruit & Steamship Co.,* 277 F.Supp. 956, 957 (S.D.N.Y.1967) (noting that the term "ownership" has "chameleonesque qualities"). This is not, then, the sort of case where the agency has gotten out "the Dictionary of Newspeak and pronounce[d] that for purposes of its regulation war is peace...." *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 412 (7th Cir.1987).

But the FCC may only give the words "ownership interest, direct or indirect" a meaning that serves the values the provision is supposed to embody. Otherwise, the interpretation cannot be regarded as "reasoned". See *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970) ("Reasoned decision promotes results in the public interest by requiring the agency to focus on the values served by its decision, and hence releasing the clutch of unconscious preference and irrelevant prejudice.").

Section 22.921(c), the FCC has said, "is intended to prevent applicants from unfairly skewing the lottery by receiving cumulative chances to win". *Telephone Data Sys., Inc.,* 6 F.C.C.R. 220, 271 (Comm.Car.Bur.1991). Chances to win exactly what? As CTSI understands it (with support, as we shall see below, in FCC decisions), the Commission's intent is to prevent excessive accumulations of chances to win the *economic benefits* of the license lottery. Here we do not see how Trumbower could possibly use whatever influence he might have over Pritchard by virtue of their common interests in SSE to gain a greater than 4% economic interest in CTSI's application. The trust instrument gives the trustee no power to transfer beneficial ownership in CTSI or in CTSI's license application to SSE (and thus, indirectly, to its shareholders) unless the Commission itself finds that such a transfer would not violate FCC rules, changes its rules to allow such transfers, or grants a waiver to CTSI.[1] In other words, any beneficial interest Trumbower might acquire in CTSI's application beyond his original 4% interest (to which the FCC has not objected) is contingent on FCC consent, direct or indirect.

While there might be some purpose to the rule other than (or in addition to) preventing

---

1. Paragraph 5 of the agreement permits the trustee to reconvey the CTSI stock to SSE if "(a) the FCC shall have released an order, not subject to further administrative or judicial review, determining that Trustee may make such reconveyance and redelivery without causing the disallowance or loss of any cellular license that may have been awarded; or (b) the Trustee shall have received an opinion of legal counsel ... concluding that the FCC shall have amended, clarified, or interpreted its rules ... to remove any impediment to such reconveyance and redelivery, or

that the existing FCC rules permit such reconveyance and redelivery." In denying CTSI's motion for reconsideration, the Common Carrier Bureau conceded "the fact that the provisions of the trust instrument forbid the reconveyance of CTSI stock to SSE's new shareholders, absent prior Commission approval", though it believed the Mobile Services Division had properly found that Pritchard had "a predisposition not to comply with the insulation provisions of the trust", 6 F.C.C.R. at 5815 ¶ 10, a ground neither adopted by the Commission nor pressed before us.

excessive accumulation of chances at economic advantage, the FCC has given no indication what it might be. In the context of this case, the FCC's only explanation for why the trustee must be independent is that "independence [is] demanded in these situations" and that its "strict" application of the rule "assure[s] administrative fairness to those who comply with our ... cross-ownership restrictions, the lack of economic gain notwithstanding." *Corp. Telecom,* 9 F.C.C.R. at 1013 ¶ 10. If the allusion to "administrative fairness" is intended to argue the advantages of a bright-line rule, it does not help the Commission here. The Commission has not in fact drawn a bright line between when a trustee has enough independence and when not. And, even if it had, it would still have to state how the rule relates to a purpose other than brightness of line. See *Athens Community Hosp., Inc. v. Shalala,* 21 F.3d 1176, 1180 (D.C.Cir.1994) (ease of administration alone cannot support a rule that serves no substantive goal).

The Commission's contention that a long line of FCC precedent provides clear interpretive guidance supporting its decision is just not true. We do not see how *Chickasaw Telephone Company for the Benefit of CTC Scholarship Trust,* 8 F.C.C.R. 600, 601 ¶ 7 (1993), *aff'd,* 24 F.3d 1464 (D.C.Cir.1994); *FTC Communications,* 75 F.C.C.2d 15 (1979); or *Florida Cellular Mobil Communications Corp.,* 6 F.C.C.R. 6910 (1991), *reconsideration denied,* 7 F.C.C.R. 7856 (1992), *aff'd,* 28 F.3d 191 (D.C.Cir.1994), which the Commission invokes, see *Corp. Telecom,* 9 F.C.C.R. at 1012 nn. 5 & 8, could possibly be construed as establishing principles relevant to the resolution of this case. In *Chickasaw Telephone Co.,* the FCC rejected a nonwireline license application because it found that the real party in interest was not a trust (as claimed) but the trust's settlor, a telephone company that was ineligible for a nonwireline license under 47 CFR § 22.902(b). The decision revolved around a close analysis of the application itself, with the Commission stressing that the application identified the applicant as a corporation organized under Oklahoma law (which the settlor was, whereas the trust had purportedly been established under Texas law); that the application was signed not by the trustee but by the settlor's president; and that an exhibit to the application "referred to [the settlor corporation] as the real party in interest." 8 F.C.C.R. at 601 ¶ 7. In an obscure footnote, the Commission remarked that the initial trustee was the settlor corporation's accountant, and observed generally that "entities should not be permitted to create a separate entity to apply for a license in order to circumvent our filing rules". *Id.* at 601 n. 3. Whatever this may have meant, it was surely not an assertion that a relationship between the settlor and the trustee would in itself make a trust defective for all purposes. Indeed, the FCC explicitly stated that because it had determined that the settlor was the real party in interest, it "need not address arguments regarding whether, assuming CTC Trust was the applicant," it would have been proper to dismiss the application. *Id.* at 601–02 ¶ 10 (speculating, however, that had the application been filed by the CTC Trust, the FCC might deem the trust "ineligible as the representative of a wireline carrier", "given the circumstances surrounding the filing of the application").

*FTC Communications* appears equally off point. In that case, the FCC authorized a French-owned U.S. corporation to acquire additional U.S. gateways, based on the corporation's plan to transfer control over its operations to an independent U.S. trustee; the proposed transfer, the FCC found, alleviated concerns that the authorizations violated the FCC's mandate to ensure reciprocity between foreign countries and the United States in the treatment of communications companies. A secondary problem in the case involved whether the trust agreement would ensure compliance with the alien ownership restrictions of 47 U.S.C. § 310, the purpose of which is "to 'safeguard the United States from foreign influence' in broadcasting", *Moving Phones,* 998 F.2d at 1055, but the FCC explicitly found it not "necessary to reach" that problem. See *FTC Communications,* 75 F.C.C.2d at 26 ¶ 30. And *Florida Cellular Mobil Communications Corp.* stands simply for the proposition that the FCC adheres strictly to its rules and will not grant a waiver of the cross-ownership re-

striction just because the violation was inadvertent. See 6 F.C.C.R. at 6910 ¶ 5.

The only rules and orders to which the FCC points that seem even superficially relevant here deal with the prohibitions on multiple ownership of broadcast stations, see 47 CFR § 73.3555, and on broadcast television/cable television cross-ownership, see *Wolverine Cablevision, Inc.*, 69 F.C.C.2d 1487, 1492 (1978) (construing 47 CFR § 76.501). But these rules appear to have been designed with completely different purposes in mind. The Commission has stated numerous times that the limits on cross- and multiple ownership of broadcast licenses contained in § 73.3555 and § 76.501 aim to "foster *programming diversity* by encouraging diversity of ownership, and to assure competition".[2] The Commission does not appear to believe that § 22.921(c)'s ban on ownership interests in competing applications for cellular service is aimed at diversity of communications, and any such view would be hard to justify in light of the provider's complete lack of control over the content transmitted. See *Chesapeake & Potomac Tel. Co. v. United States*, 42 F.3d 181, 196 (4th Cir.1994) (noting that 47 U.S.C. § 202 (1988) "precludes [common carriers] from exercising editorial control over the communications they transmit."); see also *MCI Cellular Tel. Co. v. FCC*, 738 F.2d 1322, 1323, 1326 n. 2 (D.C.Cir. 1984) (describing both wireline and nonwireline cellular service providers as "common carriers" and stating, "As a common carrier,

the wireline licensee is required to sell cellular service to all who desire to purchase it.").

These differences in purpose are reflected in obvious differences between the rules' language. Both § 76.501 and § 73.3555 explicitly sweep far more broadly than § 22.921(c), explicitly proscribing not only cross- or multiple *ownership* but also *operation or control.* See, e.g., 47 CFR § 73.3555(a)(1) ("directly or indirectly *owned, operated, or controlled*") (emphasis added); 47 CFR § 73.3555(c) ("owns, operates or controls"); 47 CFR § 73.3555(e)(1) ("owning, operating or controlling"); see also 47 CFR § 73.3555 n.1 ("The word 'control' ... is not limited to majority stock ownership, but includes *actual working control in whatever manner exercised*.") (emphasis added); 47 CFR § 76.501 ("directly or indirectly owns, operates, controls, or has an interest in"). And while the broadcast and broadcast/cable rules focus on *voting* stock interests, see 47 CFR §§ 73.3555 n.2 & 76.501 n.2, the cellular phone application rule draws no such distinction. The difference makes sense. The broadcast and broadcast/cable rules address concerns about content control; § 22.921(c) evidently does not.

We note finally that these differences in purpose and in language have unsurprisingly resulted in divergent FCC decisions. Thus, from 1976 until 1992 the Commission indulged a presumption under § 73.3555 and § 76.501 that one spouse's media interests should be attributed to the other, a presumption that for a time was nearly "conclusive".

---

2. Broadcast Services: Television and Radio Broadcasting, 60 Fed.Reg. 6483 ¶ 1 (to be codified at 47 CFR pt. 73) (proposed Feb. 2, 1995) (describing purpose of § 73.3555) (emphasis added); *id.* at 6484 ¶ 9 (seeking comment on whether particular levels or degrees of ownership interests in, or relationships to, a licensee "would be likely to impart the ability to influence or control the operations of the licensee, including core functions such as programming, such that the multiple ownership rules should be implicated"); see also Attribution of Ownership Interests, 97 F.C.C.2d 997, 999 (1984) ("fundamental purpose" of original prohibition on multiple ownership of broadcast stations was "to promote diversification of ownership in order to maximize diversification of program and service viewpoints as well as to prevent undue concentration of economic power....") (citation and internal

quotation marks omitted); Network–Cable Cross–Ownership Rule, 57 Fed.Reg. 35468, 35468/2, 35469 ¶ 7 (1992) (describing original intent of § 76.501(a)(1), "To curb network dominance of the video marketplace and to protect the cable industry in its incipient stage of development", and stating the Commission's belief that, given changed market conditions, the rule's "absolute prohibition against network-cable cross-ownership" need no longer be retained "in order to protect competition and diversity"); Community Antenna Television Systems, 35 Fed. Reg. 10903, 10905 ¶¶ 9, 12, 13, 15 (1970) (second report and order, adopting cable/network cross-ownership restrictions) (referring to restrictions' goals variously as "diversity of control over local mass communications media", "diversity of television programming" and "diversity to the CATV subscribing portion of the public").

See *Broadcast Services; Commission Policies Regarding Spousal Attribution,* 57 Fed. Reg. 8845, 8846 ¶ 4 (1992). While in 1992 the Commission discarded the presumption in the broadcast and cable/broadcast sphere, it appears never to have applied it at all in evaluating lottery applications under § 22.921(c). Indeed, in *Nancy Naleszkiewicz,* 5 F.C.C.R. 7131 (Mobile Serv. Div.1990), the Common Carrier Bureau rejected the argument that a husband and wife had disqualifying interests in each other's applications—despite the fact that, in addition to being married to each other, they together owned and operated a company that allegedly prepared both applications. See also *id.* at 7131 ¶ 7 (noting that the party opposing Naleszkiewicz's application "acknowledges that a spousal relationship, standing alone, is not enough to create a presumption that the ownership interests are not separate.") Thus it seems clear that the Commission regards relationships that are at least suspect and may be fatal under § 73.3555 and § 76.501 as perfectly acceptable under § 22.921(c). In view of the sections' differing objectives, this seems natural, indeed inevitable.

Because the Commission may have some theory under which its rejection of CTSI's application, and the idea of ownership implicit in that rejection, might fit within the purposes of § 22.921(c), we remand the case to the Commission. See *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[C]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review.").

*So ordered.*