C.F. COMMUNICATIONS
CORPORATION, et
al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Century Telephone of Wisconsin,
Inc., et al., Intervenors.

Nos. 95–1563, 95–1566.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 2, 1997.

Decided Oct. 31, 1997.

Albert H. Kramer, Washington, DC, ar-
gued the cause for petitioners, with whom
Robert F. Aldrich and Andrew J. Phillips
were on the briefs.

Aaron. J. Rappaport, Attorney, Federal
Communications Commission, Washington,
DC, argued the cause for respondents. Wil-
liam E. Kennard, General Counsel, Daniel M.
Armstrong, Associate General Counsel, John
E. Ingle, Deputy Associate General Counsel,
and Carl D. Lawson, Counsel, Federal Com-
munications Commission, Joel I. Klein, Act-
ing Assistant Attorney General, United
States Department of Justice, Robert B. Ni-
cholson and Robert J. Wiggers, Attorneys,
were on the brief. Susan L. Fox, Counsel,
Federal Communications Commission, en-
tered an appearance.

M. Edward Whelan, III, Los Angeles, CA,
argued the cause for intervenors, with whom
Benjamin H. Dickens, Jr., Susan J. Bahr,
and David L. Nace, Washington, DC, were

on the brief. David J. Gudino, Irving, TX, entered an appearance.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

These petitions seek review of a Federal Communications Commission decision permitting local telephone companies (known as "local exchange carriers" or "LECs") to assess End User Common Line ("EUCL") charges on an independent payphone provider. Petitioners—the independent payphone provider and a trade association of independent payphone providers—argue that the Commission misinterpreted its rules to arrive at its decision. We agree, and grant the petitions for review.

## I. Background

### A.

When a telephone customer places a call, a "loop" links the telephone to the central office of a local exchange carrier, where switching equipment routes the call to a local or long-distance telecommunications network. Most of the LECs' costs in operating their facilities do not vary depending on how often the facilities are used; such costs are known as "nontraffic sensitive" ("NTS") costs. The cost of installing the loop is an NTS cost, for example, because that cost remains the same whether a customer uses the loop to make one call or one hundred calls. *See National Ass'n of Regulatory Util. Comm'rs v. F.C.C.,* 737 F.2d 1095, 1104 (D.C.Cir.1984). In contrast, the cost of the switching equipment tends to increase with use, and is considered to be traffic-sensitive. *Id.*

In 1983, the Commission released rules governing the charges through which LECs would be compensated for providing long-distance carriers (known as "interexchange carriers" or "IXCs") with access to their local exchange facilities. *In re MTS and WATS Market Structure, Third Report and Order,* 93 F.C.C.2d 241, 242–43 (1983) ("*Access*

*Charge Order*"), *modified on recon.,* 97 F.C.C.2d 682 (1983) ("*Access Charge Reconsideration*"), *modified on further recon.,* 97 F.C.C.2d 834 (1984), *aff'd and remanded in part sub nom. National Ass'n of Regulatory Util. Comm'rs v. F.C.C.,* 737 F.2d 1095 (D.C.Cir.1984). The Commission decided that, as a general matter, "end users" placing interstate calls should bear the cost of the access charges. Therefore, the Commission's rules provided that most subscribers were assessed a monthly, flat-rate charge for the "end user common line" element, permitting LECs to recover a significant amount of the NTS costs associated with the subscribers' loops.

In crafting its rules, the Commission faced a dilemma: how to permit LECs to recover their investment in the public payphones (and payphone lines) that they owned and operated. Payphones required special treatment, reasoned the Commission, because the end users of payphones consisted of the "transient general public," rather than the subscribers, as in the case of private business or residential telephones. *See In re C.F. Communications Corp. v. Century Telephone of Wisconsin, Inc.,* 8 F.C.C.R. 7334, 7335 ¶ 10 (Com. Car. Bur.1993) ("*Bureau Order*"). At first, the Commission determined that LECs would recover their payphone investments solely through coin calls placed by end users. *Access Charge Order* at 280. Under this solution, however, LECs were not able to recover their investment from the many end users who used payphones to make non-coin calls, such as collect, credit card or third-party calls, causing either an inadequate recovery for the LECs or a disproportionate burden on end users paying by coin. *Access Charge Reconsideration* at 705.

On reconsideration, the Commission decided not to assess any charge on end users of public payphones. Rather, the Commission decided that LECs would recover the NTS costs of operating their payphones and payphone lines from a carrier common line element, which in turn was recovered from the switched access charges imposed on IXCs and interstate calls in general. *Id.* In other words, the Commission decided that public payphone users would no longer pay for the

NTS costs of operating public payphones, but that those costs would in effect be subsidized by all interstate callers.

The Commission, however, did not exempt *all* payphones from EUCL charges. Although it excused "public" payphones from the charge, it determined that "semi-public" payphones would be subject to the charge. When it originally announced the public/semi-public distinction, the Commission explained that "[a] pay telephone is used to provide semipublic telephone service when there is a combination of general public and specific customer need for the service, such as at a gasoline station or pizza parlor. [Local telephone companies] provide directory listing with this service." *Id.* at 704 n. 40. By contrast, "[a] pay telephone is used to provide public telephone service when a public need exists, such as at an airport lobby, at the option of the telephone company and with the agreement of the owner of the property on which the phone is placed." *Id.* at 704 n. 41. The Commission determined that NTS costs associated with semi-public payphones should be "recovered from subscribers to that service in the same manner that costs associated with an ordinary business subscriber line are recovered" because "[t]hose fixed costs can be recovered from an identifiable business end user through flat charges." *Id.* at 706.

At the time the Commission developed this scheme for payphone access charges, the only existing payphones were owned by LECs. LEC-owned payphones are connected by special "coin lines" to an LEC central office. A processor located at the central office then does most of the work: determining the cost of the call, timing the call, telling the user how much money to deposit, and performing additional tasks. Because they are not capable of processing and supervising calls on their own, LEC-owned payphones are considered to be "dumb."

In 1984, the Commission permitted payphones not owned by LECs to enter the market. Unlike LEC-owned payphones, the new independent payphones were "smart," capable of processing and supervising calls by means of a microprocessor located inside the phone. These "smart" payphones were attached to ordinary telephone lines; because they were self-sufficient, there was no need for special "coin lines" to link them to an LEC central office. Callers encounter independent payphones in the same places where they would find LEC-owned payphones, such as street corners, airports, shopping malls, and rural "mom and pop" stores. Since callers are not able to tell whether a given payphone is "smart" or "dumb," from a caller's point of view, independent payphones are indistinguishable from those owned and operated by LECs.

## B.

Petitioner C.F. Communications Corporation ("CFC") operates independent payphones in Wisconsin, Michigan, Minnesota and Iowa. On May 10, 1989, CFC filed a complaint with the Commission challenging several LECs' imposition of EUCL charges on CFC's independent payphones. Petitioner American Public Communications Council, Inc., a trade association of the independent payphone industry, intervened in and participated in the complaint proceeding on CFC's behalf.

In its complaint, CFC argued that it should be excused from EUCL charges because it did not qualify as an "end user" under the Commission's rules. CFC also argued that its payphones should be classified as "public"—and therefore exempt from EUCL charges—because they were located in public places and accessible to all members of the public. Accordingly, CFC sought damages from the LECs in the amount of the EUCL payments it had made to them.

The FCC's Common Carrier Bureau rejected CFC's arguments, and held that the LECs had properly assessed EUCL charges on CFC's independent payphones. *See Bureau Order.* In the Order challenged in this case, the Commission affirmed the Bureau's decision. *See In re C.F. Communications Corp. v. Century Telephone of Wisconsin, Inc.,* 10 F.C.C.R. 9775 (1995) (*"Order"*). The Commission found that CFC was an "end user" under its rules, and thus subject to EUCL charges. Specifically, the Commission found that CFC met the regulatory

definition of "end user" because it "offers telecommunications services exclusively as a reseller" and that all such resale transactions "originate on [CFC's] premises." *See* 47 C.F.R. § 69.2(m).

The Commission further concluded that CFC's independent payphones did not qualify for the "public telephone" exemption from the EUCL charges. Relying on an FCC rule defining "public telephone" as being "provided by a telephone company," 47 C.F.R. § 69.2(ee), the Commission reasoned that CFC's payphones were not "public" because CFC is not a "telephone company" under the applicable rules. *See* 47 C.F.R. § 69.2(hh). In addition, the Commission deemed CFC's payphones to be "semi-public" because—regardless of how they were actually used—they were *capable* of private use. *Order* at 9780, ¶ 21.

### C.

The Telecommunications Act of 1996 became law on February 8, 1996. Pursuant to the Act, the Commission initiated a rulemaking proceeding to revise its rules governing payphones. On September 20, 1996, and in several subsequent orders on reconsideration, the Commission required the *prospective* application of EUCL charges to both independent payphones and to LEC-owned payphones. The Commission's decision had no effect on the challenged EUCL charges that CFC incurred prior to the effective date of the new rules.

### II. Discussion

■ As a liminal matter, we note that we accord great deference to an agency's interpretation of its own rules. Our deference under these circumstances has sometimes been described as even greater than our deference to an agency's interpretation of ambiguous statutory terms. *See Capital Network System, Inc. v. F.C.C.,* 28 F.3d 201, 206 (D.C.Cir.1994) (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). An agency's interpretation of its own rule " 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Id.* (quoting *United*

*States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977)).

Here, the Commission interpreted its rules to find that (1) CFC is an "end user" subject to EUCL charges; and (2) CFC's payphones are not "public telephones" and therefore do not qualify for the "public telephone" exemption from EUCL charges. Keeping in mind our great deference to the Commission's interpretation of its rules, we review the Commission's interpretations below.

### A.

■ As its name implies, the End User Common Line charge is assessed on an "end user." 47 C.F.R. § 69.5(a) ("End user charges shall be computed and assessed upon end users . . . ."). Under the Commission's access charge rules, an "end user" is defined as:

> [A]ny customer of an interstate or foreign telecommunications service that is not a carrier except that a carrier other than a telephone company shall be deemed to be an "end user" when such carrier uses a telecommunications service for administrative purposes and a person or entity that offers telecommunications services exclusively as a reseller shall be deemed to be an "end user" if all resale transmissions offered by such reseller originate on the premises of such reseller.

47 C.F.R. § 69.2(m).

It is not disputed that CFC, a reseller of LEC services, qualifies as a "carrier" under this rule. *Bureau Order* at 7336, ¶ 12; *Order* at 9777, ¶ 10. As a "carrier," CFC is deemed to be an "end user" if it meets one of the two conditions listed above. According to the Commission, CFC is an "end user" because it meets the second condition: it "offers telecommunications services exclusively as a reseller," and "all resale transmissions offered by such reseller originate on the premises of such reseller." 47 C.F.R. § 69.2(m).

To determine if all of CFC's transmissions originate "on the premises of [CFC]," the Commission analyzed the word "premises," which is not defined in the Commission's rules. Observing that the word "does not

have a single fixed meaning" and is "defined according to its context," *Order* at 9778, ¶ 13, the Commission found that in the context of Section 69.2(m), "premises" means "the place where, in most cases, the equipment of the reseller is located and where the use of the resold telecommunications services must originate." *Id.* at 9779, ¶ 17. Under this reading, every location where CFC contracts to place a payphone would be considered CFC's "premises."

While the Commission is correct that the word "premises" "does not have a single fixed meaning," *accord Gibbons v. Brandt,* 170 F.2d 385, 387 (7th Cir.1948); *O'Connor v. Great Lakes Pipe Line Co.,* 63 F.2d 523, 525–26 (8th Cir.1933), this fact does not convert the word into a sort of Rorschach test, permitting the Commission to read into the word anything it pleases. We find that the Commission's interpretation of the word "premises" is so far removed from any established definition of that word that we must reject its interpretation as plainly erroneous.

CFC's payphones are the personal property of CFC. An agreement between CFC and the Central Wisconsin Airport of the City of Mosinee, which is "typical" of CFC's agreements with other location owners, Skrypczak Affidavit ¶ 5, explicitly states that CFC owns the payphones, and that the "[t]elephones, booths and equipment are ... personal property."

The term "premises," as used in this context, traditionally refers to real property and its appurtenances. BLACK'S LAW DICTIONARY 1062–63 (5th ed.1979). Black's Law Dictionary defines the term as "[a] distinct and definite locality, and may mean a room, shop, building, or other definite area, or a distinct portion of real estate." No matter how flexible the meaning of "premises" may be, an item of personal property may not sensibly be construed to be a "locality," a "definite area," or a "distinct portion of real estate." Assuming a payphone could be considered "premises" as appurtenant to land, that would not make CFC's payphones the premises of the company as CFC neither owns nor controls the land or buildings on which its payphones are sited. The Commission has provided no definition under which personal property located on real property owned by another is considered to be "premises," and we are aware of none.

■ The Commission, alternatively, suggests that "premises" means the land or buildings on which CFC's payphones are located. *Order* at 9778, ¶¶ 14–15. Recognizing that others actually own the land or buildings on which the payphones are located, the Commission found it significant that CFC had what it termed "limited legal control" over the land or buildings on which its payphones were located. The Commission did not explain the nature or source of this limited control, but found that its existence justified treating the land or buildings as CFC's "premises," even if CFC did not own the land. *Id.* In other words, the Commission decided to treat land owned by someone else as the "premises" of CFC on the theory that CFC acquired an interest in the property by contracting to place its payphone there. In so doing, the Commission has not only distorted the plain meaning of "premises" beyond any reasonable interpretation of the word, but has rendered the phrase "originate on the premises of the reseller" virtually meaningless. If any location in which a "reseller" has the capacity to originate a call becomes its premises, that requirement of the rule excludes nothing. The Commission's interpretation, then, violates the familiar principle of statutory interpretation which requires construction "so that no provision is rendered inoperative or superfluous, void or insignificant." *Mail Order Ass'n of America v. United States Postal Service,* 986 F.2d 509, 515 (D.C.Cir.1993) (internal quotations and citations omitted).

We do not suggest that the Commission could not amend its rules to render "premises" a term of art encompassing telephone equipment or land owned and controlled by a third party on which telephone equipment is located. But to do so, it must use the notice and comment procedure of the Administrative Procedure Act. It may not bypass this procedure by rewriting its rules under the rubric of "interpretation." *See Indiana Michigan Power Co. v. Dept. of Energy,* 88 F.3d 1272, 1276 (D.C.Cir.1996) ("The [agency's] treatment of this statute is not an inter-

pretation but a rewrite."). In this case, the Commission's interpretation of Section 69.2(m) does not comport with the plain meaning of the term "premises" and must be rejected.[1]

### B.

 In addition to our conclusion that the Commission erred in determining that CFC was an "end user," we also hold that petitioners are entitled to the relief sought for the alternate reason that the Commission improperly discriminated between similarly situated phone services without a rational basis. As we noted earlier, public telephones are not subject to EUCL charges under the Commission's *Access Charge Reconsideration* decision. In determining that CFC's payphones were not subject to the "public telephone" exclusion, the Commission relied on the following definition of "public telephone": a "telephone provided *by a telephone company* through which an end user may originate interstate or foreign telecommunications for which he pays with coins or by credit card, collect or third number billing procedures." 47 C.F.R. § 69.2(ee) (emphasis added). Finding that CFC is not a "telephone company," the Commission determined that CFC's payphones did not qualify for the EUCL fee exemption. *Order* at 9779–80, ¶¶ 19–20.

CFC concedes that it is not a "telephone company" under Section 69.2(ee), but argues that the Commission improperly applied that definition in this context. It observes that Section 69.2(ee) was promulgated without explanation several years after the Commission adapted its access charge rules, and further observes—and the Commission does not dispute—that the Commission drafted this definition with another purpose in mind: clarifying the rules on allocation of LECs' own investments in payphone equipment to particular access charge elements.

We agree that the Commission's reliance on the definition of "public telephone" in Section 69.2(ee) does not provide sufficient justification for its distinction between CFC's

payphones and those operated by LECs. *See Corporate Telecom Services, Inc. v. F.C.C.*, 55 F.3d 672, 677 (D.C.Cir.1995) (rejecting the FCC's citation of "rules [which] appear to have been designed with completely different purposes in mind"). When considered in its intended context, Section 69.2(ee) makes sense: the Commission defined "public telephone" to exclude independent payphones to clarify that, under the rules governing LECs' recovery of their investment in payphone equipment, LECs were not entitled to recover independent payphone costs. In other words, Section 69.2(ee) makes it plain that LECs may recover only their investment in "public telephones" which they own and control, not in independent telephones which are owned by others. However, the Commission has shown no rational connection between Section 69.2(ee) and the public/semi-public telephone distinction in its *Access Charge Reconsideration* decision. As explained earlier, the Commission exempted public payphones from EUCL charges because it recognized that there was no practical way to ensure that NTS costs were being shared equally by all interstate end users of those payphones. In light of the Commission's reasons for introducing the public/semi-public distinction, we find that it has not shown any legally significant difference between "public" payphones owned by an LEC and those of the independent payphone providers.

The Commission simply—and, we think, unreasonably—ignored context and stated that "we must apply our rules as they are now codified." *Order* at 9780, ¶ 20. The Commission put on blinders after it found that CFC did not meet its definition of "public telephone," not acknowledging that the definition had been adopted in a different context; that the "public telephone" exemption to the EUCL charges was introduced in a Commission order, not in its rules; and that the Section 69.2(ee) definition of "public telephone" was inconsistent with the original rationale for introducing the exemption in the *Access Charge Reconsideration* decision.

**1.** Having determined that the Commission's interpretation of "premises" fails to pass muster, we need not address its conclusion that CFC

"offers telecommunications services exclusively as a reseller" under Section 69.2(m). *Order* at 9779, ¶ 18.

We find that the Commission's interpretation is not "reasoned," *see Corporate Telecom Services,* 55 F.3d at 675 (rejecting FCC's rule interpretation as inconsistent with the "values the provision is supposed to embody"), and therefore reject its conclusion that CFC's payphones are not "public telephones" for purposes of the exclusion from EUCL charges.

### C.

Having found that CFC's payphones did not qualify for the exclusion because they were not "public telephones," the Commission declared that CFC's payphones were ineligible because they were "semi-public." *Order* at 9780, ¶ 21. Rejecting petitioners' request that it should decide if the payphones were public or semi-public by examining how the payphones were used, the Commission found it "more relevant to examine how [CFC's] payphone lines *can* be used." *Id.* (emphasis in original). The Commission then found that CFC's payphones were *capable* of private use because, like conventional telephones, they were connected to regular subscriber business lines. This technical point—that CFC's payphones were connected to regular subscriber business lines as opposed to the coin lines attached to LEC-owned payphones—was the Commission's sole reason for finding that CFC's payphones were semi-public and not qualified for the EUCL charge exemption. *Bureau Order* at 7336, ¶ 13; *Order* at 9780, ¶ 21. The Commission attempts to justify its distinction by arguing that under the *Access Charge Reconsideration* decision the existence of an "identifiable subscriber" was the most important factor in determining that payphones were public rather than semi-public.

The Commission has not adequately justified the distinction it has drawn between CFC's payphones and LEC-owned payphones. First, the Commission improperly relies on the *Access Charge Reconsideration* decision. In that decision, the Commission rejected its earlier approach of assessing a per-call charge on payphone callers to recover the interstate NTS costs of the payphone line, observing that it would be inequitable for those who used coins to make payphone calls, representing "only a fraction of those using pay telephones," to bear the cost of the EUCL charges. *Access Charge Reconsideration* at 704. Recognizing that the "ideal solution" of recovering NTS costs of public payphones from "end users who rely upon pay phones to originate their interstate calls" was not technologically feasible, the Commission decided instead to eliminate the per-call charge on public payphone users entirely. *Id.* at 705. The Commission, then, created an exemption for public payphones because, due to the transient nature of payphone users, there was no ultimate *end user* from whom the charge could be recovered equitably. Thus, notwithstanding the Commission's argument to the contrary, the existence of an identifiable *subscriber* was not the controlling factor in its decision to exempt public payphones from the EUCL charge, as the caller, not the subscriber, is the ultimate end user in any event.

More importantly, even if the Commission had originally justified its distinction between public and semi-public payphones on the ground that semi-public payphones are subject to EUCL charges because of the existence of an identifiable subscriber, such an approach does not adequately explain why the Commission exempted LEC-owned payphones from the EUCL charge, but treated CFC's payphones as subject to the charge. After all, the Commission's express reason for exempting public payphones from EUCL charges applies to CFC's payphones as well as to LEC-owned payphones. Furthermore, the record reflects that CFC's payphones are indistinguishable from LEC's payphones from a consumer's point of view; at oral argument, counsel for the Commission conceded that a consumer making a call from a bank of payphones would have no idea whether that phone was independently owned or owned by an LEC. And the Commission does not dispute that CFC's payphones are indeed held out for use by the general public. *See Order* at 9780, ¶ 21 ("[W]e recognize that it is not CFC's intent to provide private service via its payphones.").

We also hold that the Commission erred when it focused on how CFC's payphones

*could be* used, as opposed to how they were used. As we explained above, this test led the Commission to conclude that CFC's payphones were "semi-public" because they were connected to ordinary business subscriber lines, as opposed to special coin lines. The *Access Charge Reconsideration* decision, which introduced the distinction between "public" and "semi-public" for purposes of the EUCL charge, does not mention this "capability of use" distinction, and further suggests that the key distinction was meant to be actual use. *See Access Charge Reconsideration* at 704 n.40 ("[A] pay telephone is *used* to provide semipublic telephone service when there is a combination of general public and specific customer need for the service, such as at a gasoline station or pizza parlor.") (emphasis added). Further, since the record does not indicate that the loop costs of LEC-owned payphones are significantly different from those of CFC's payphones—and indeed, under the current regime, both types of payphones are subject to the EUCL charge—the technical distinction drawn by the Commission here has no apparent relevance to the access charge at issue.

### D.

We note that the Communications Act provides that "[i]t shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges ... for ... like communication service." 47 U.S.C. § 202(a). To determine if a carrier is discriminating in violation of this provision, the Commission asks: (1) whether the services are "like"; (2) if they are, whether there is a price difference between them; and (3) if there is, whether that difference is reasonable. *Competitive Telecommunications Ass'n v. F.C.C.*, 998 F.2d 1058, 1061 (D.C.Cir. 1993). To determine if services are "like" under this provision, the Commission must "look to the nature of the services offered and ascertain whether customers view them as performing the same functions." *Id.* (internal quotations and citation omitted).

Here, the Commission never explicitly considered whether CFC's payphones and LEC-owned payphones provided "like" services. Rather, it found that the LECs which had

assessed EUCL charges against CFC had not discriminated in violation of Section 202(a) because the LECs had followed FCC rules when assessing these charges. *Order* at 9780, ¶ 23. Given our conclusion that the Commission misinterpreted its rules, it appears that the Commission's *Order* may have compelled LECs to discriminate in violation of Section 202(a): consumers view CFC's payphones and LEC-owned payphones as performing the same functions, and only LEC-owned payphones are exempted from the EUCL charges. Because we vacate the Commission's *Order* and remand for further proceedings, however, we need not resolve whether the Commission's interpretation compelled LECs to discriminate under Section 202(a), or the precise consequences if it did.

Joined by Intervenor LECs Century Telephone of Wisconsin, North–West Telephone Company and GTE North Incorporated, the Commission argues that CFC may not recover the EUCL charges it has already paid because the LECs which collected those charges did so in compliance with Commission rules. Although we recognize the importance of this issue, we need not resolve it here in light of our holding that the Commission misinterpreted its own rules.

### III. Conclusion

The Commission has articulated a difference between CFC's payphones and LEC-owned payphones: CFC's "smart" payphones are connected to ordinary business subscriber lines and LEC-owned "dumb" payphones are connected to special coin lines. It has not, however, sufficiently explained why this difference justifies its decision to assess EUCL charges on the "smart" payphones but not the "dumb" payphones. For this reason, and because the Commission's interpretation of its rules was clearly erroneous, we vacate the Commission's *Order* and remand for further proceedings consistent with this opinion.