Joseph Robert KELSO, Plaintiff,

v.

U.S. DEPARTMENT OF
STATE, Defendant.

Civil Action No. 98–00874 CKK.

United States District Court,
District of Columbia.

April 29, 1998.

Nancy A. Luque, Kathleen H. McGuan, Reed Smith Shaw & McClay, Washington, DC, for plaintiff.

Marina Utgoff Braswell, United States Attorney's Office, Washington, DC, for defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Plaintiff Joseph Robert Kelso, a citizen of the United States currently located in the United Kingdom and the alleged subject of a federal warrant of arrest, brings this action to vacate the State Department's decision to revoke his passport. Mr. Kelso attacks the validity of the State Department's revocation

on three grounds: (1) that the absence of a pre-revocation hearing violates the Fifth Amendment's Due Process Clause; (2) that the regulations empowering the Secretary of State to revoke passports exceeds her delegated authority; and (3) that notwithstanding whatever legal infirmities may plague them, the State Department's own regulations compel the Secretary to return Mr. Kelso's passport. Before the Court are Mr. Kelso's Motion for a Temporary Restraining Order or Preliminary Injunction, the State Department's Opposition thereto, Plaintiff's Reply, and Defendant's Supplemental Opposition.[1] Having considered the oral arguments, pleadings, affidavits, controlling law, legislative history, and administrative practice, the Court grants Plaintiff's Motion for a Preliminary Injunction for the reasons, and to the extent, set forth below.

## I. BACKGROUND

On May 8, 1990, the Los Angeles passport agency issued passport number 033549178 to Plaintiff Joseph Robert Kelso. *See* Am. Compl. ¶ 4. Having used his passport on numerous occasions since 1990, Mr. Kelso most recently presented it to British authorities to enter the United Kingdom on December 27, 1997. *See id.* ¶ 5. Shortly after Mr. Kelso arrived in the United Kingdom, the United States District Court for the Western District of Washington issued a warrant of arrest for an individual named Joseph R. Kelso. *See* Def.'s Opp'n at Ex. 1 (Warrant for Arrest in *United States v. Joseph R. Kelso,* CR98–11C, Jan. 8, 1998, (W.D.Wash.)).[2] On January 20, 1998, the

Federal Bureau of Investigation forwarded a formal request to the State Department to revoke Plaintiff's passport. *See id.* at Ex. 2 (letter from Special Agent Cary L. Vanderberry to Greg Hays, Jan. 20, 1998); *id.* at Ex. 3 (memorandum from Greg Hays to Sharon Paler–Royston, Director of the Legal Division, Office of Passport Policy, Planning and Advisory Services, Passport Services, Bureau of Consular Affairs, Department of State, Jan. 20, 1998). The FBI's request indicated that the Joseph R. Kelso whom they sought was a convicted federal felon who previously had been a fugitive from justice for two years during the 1980s and was believed to have fled recently to the United Kingdom due to the investigation that precipitated the warrant for arrest. *See id.* at Ex. 2.

On January 27, 1998, George W. Brazier, Consul and First Secretary at the U.S. Embassy in London, transmitted a letter to Plaintiff that informed him that the State Department had revoked his passport pursuant to 22 C.F.R. § 51.70(a)(1) and § 51.72(a). *See* Pl.'s Mot. for TRO or Prelim. Inj. at Ex. A (letter from George W. Brazier to Joseph Robert Kelso, Jan. 27, 1998). Those regulations, taken together, empower the Secretary of State to revoke a passport when a national is the subject of a federal warrant of arrest for a felony.[3] As authorized under 22 C.F.R. § 51.81, Plaintiff, through his British solicitors, requested a post-revocation hearing to contest the State Department's action on January 29, 1998. *See id.* at Ex. B (letter from Braunstein & Co to George W. Brazier, Jan 29, 1998). In a series of correspondence

---

1. After submitting his initial application for a preliminary injunction, Mr. Kelso subsequently filed an Amended Complaint with his Reply Memorandum, in which he raised for the first time his arguments that the State Department's regulations violate the Constitution and exceed congressional authorization. For this reason, the State Department was granted leave to file a supplemental opposition.

2. The warrant of arrest enumerated the following offenses: 18 U.S.C. § 371 (conspiracy to commit offense or to defraud the United States); 18 U.S.C. § 1343 (fraud by wire, radio, or television); 18 U.S.C. § 1956(a)(1)(A)(i) (laundering of monetary instruments); 18 U.S.C. § 1957(a) (engaging in monetary transactions in property derived from specified unlawful activity). For each

of the latter three offenses, the warrant of arrest indicated that Mr. Kelso would be charged as a principal under 18 U.S.C. § 2.

3. Section 51.70 provides, in pertinent part:

(a) A passport, except for direct return to the United States, shall not be issued in any case in which the Secretary of State determines or is informed by competent authority that:

(1) The applicant is the subject of an outstanding Federal warrant of arrest for a felony.... 22 C.F.R. § 51.70(a)(1). Section 51.72 authorizes the Secretary of State to revoke, restrict, or limit a passport where "[t]he national would not be entitled to issuance of a new passport under § 51.70." 22 C.F.R. § 51.72(a).

with Plaintiff's counsel, Consuelo Pachon, Attorney Adviser in the Office of Passport Policy and Advisory Services, attempted to arrange a hearing. *See id.* at Ex. D (letter from Consuelo Pachon to Leon Braunstein & Nancy Luqui, Feb. 12, 1998); *id.* at Ex. E (letter from Consuelo Pachon to Kathleen H. McGuan, Mar. 3, 1998). By March 3, 1998, Ms. Pachon had enlisted John Foarde to act as the passport-revocation Hearing Officer and suggested several potential available dates during which to conduct the hearing. *See id.* at Ex. E (letter from Consuelo Pachon to Kathleen H. McGuan, Mar. 3, 1998) ("I suggest that [the hearing] be held March 25, 26 or 27, or the week of March 30."). On March 16, 1998, however, Mr. Foarde informed Ms. Pachon that he felt compelled to recuse himself from the proceedings due to a conflict of interest. *See* Def.'s Opp'n (Aff. of Consuelo Pachon). Mr. Foarde, an Attorney Adviser in the Office of Assistant Legal Adviser for Consular Affairs, believed that it would be inappropriate to serve as a hearing officer in a case in which his office might be requested to provide a legal opinion. *See id.* Ms. Pachon then attempted to contact another individual who had indicated previously a willingness to serve as a hearing officer. *See id.* This potential substitute hearing officer never returned Ms. Pachon's phone call, and Ms. Pachon failed to pursue the matter due to a personal medical emergency. *See id.*

Arguing that 22 C.F.R. § 51.81 requires the State Department to have convened a hearing within sixty days of his January 29, 1998 request, Mr. Kelso filed suit in this Court on April 7, 1998 to vacate his passport revocation. The Court entertained oral argument on this matter on April 23, 1998.

## II. DISCUSSION

### A. *Standards Governing the Grant of Preliminary Injunctions*

For Mr. Kelso to obtain the temporary injunctive relief that he seeks, he must establish (1) a substantial likelihood of success on the merits, (2) that he would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *See CityFed Fin. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995); *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989). No single factor is dispositive; rather, the Court "must balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed,* 58 F.3d at 747. This calculus reflects a sliding-scale approach in which an injunction may issue if the arguments for one factor are particularly strong "even if the arguments in other areas are rather weak." *Id.* Thus, this Circuit has held that "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.*

### B. *Plaintiff Has Demonstrated a Strong Likelihood of Success on the Merits*

Mr. Kelso attacks the validity of the Secretary's decision to revoke his passport on three independent grounds. In Subsections II.B.1 and II.B.2 of this Memorandum Opinion, the Court rejects Plaintiff's first two arguments. Although the Court determines that 22 C.F.R. § 51.70(a)(1) and § 51.72(a) are both constitutional and promulgated with proper congressional authorization, Mr. Kelso has established a strong likelihood of success in demonstrating that the Department of State violated its own regulations when it failed to hold a post-revocation hearing within sixty-days of his request.

### 1. *The Regulations Comport with the Fifth Amendment's Due Process Clause*

 Plaintiff's first attack on the State Departments regulations is the easiest to dispose of. Mr. Kelso posits that because a passport is proof of citizenship, each and every decision to revoke a passport necessarily affects a passport holder's fundamental right of citizenship and thereby necessitates a pre-revocation hearing. This, of course, is a logical non sequitur. To be sure, 22 U.S.C. § 2705 provides that a passport has the "same force and effect as proof of United States citizenship as certificates of naturalization or of citizenship issued by the Attorney General or by a court having naturaliza-

tion jurisdiction." § 2705. Yet to admit that passports are evidence of citizenship is to say nothing about whether their revocation implicates the fundamental right of citizenship. Plaintiff interprets § 2705 as if it provided that a passport was the *exclusive* method of demonstrating citizenship. Were that interpretation correct, Plaintiff would certainly be justified in arguing that his passport revocation affected his right of citizenship. But § 2705 simply mandates that passports, like other certificates that evince citizenship, should be considered valid indicia of citizenship. Thus, although a passport holder may be deprived of proving his citizenship in one way when his passport is revoked, he has other methods of establishing citizenship. As Secretary of State Hay noted almost one-hundred years ago:

> As a general statement, passports are issued to all law-abiding American citizens who apply for them and comply with the rules prescribed; but it is not obligatory to issue one to every citizen who desires it, *and the rejection of an application is not to be construed as per se a denial by this Department or its agents of the American citizenship of a person whose application is so rejected.*

3 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW 921 (1906) (statement of Secretary of State Hay to diplomatic and consular officers, Mar. 27, 1899) (emphasis added).

It is the *reason for revocation,* not the bare act of revocation itself that may give rise to a claim of constitutional wrong. That is, unless the reason for revoking one's passport is based upon a finding of non-citizenship, the loss of a passport itself indicates nothing about the legitimacy of one's citizenship. It is for these reasons that Plaintiff's reliance on *Magnuson v. Baker,* 911 F.2d 330, 335 (9th Cir.1990), is misplaced. There, the Secretary of State had revoked the plaintiff's passport based on a suspicion of non-citizenship. By contrast, Mr. Kelso's passport was revoked because he is allegedly the subject of a federal warrant of arrest; the status of his citizenship has never been questioned. Indeed, in her March 12, 1998 letter, Ms. Pachon clearly expressed that "the passport revocation affects 'only the document

and not the citizenship status of the person in whose name the document was issued.'" Pl.'s Mot. for TRO or Prelim. Inj. at Ex. D (quoting 8 U.S.C. § 1504). Furthermore, Ms. Pachon noted that "[i]f Mr. Kelso needs documentation in order to return to the United States, such will be provided." *Id.* Moreover, where the Secretary of State cancels a passport because it was illegally, fraudulently, or erroneously obtained, Congress has explicitly provided that "[t]he cancellation under this section of any document purporting to show the citizenship status of the person to whom it was issued shall affect only the document and not the citizenship status of the person in whose name the document was issued." 8 U.S.C. § 1504. Although § 1504 by its precise terms does not encompass passport revocations due to a federal warrant of arrest, the Court believes that § 1504 embodies the basic and well-recognized principle that passport revocations do not necessarily impugn the citizenship status of passport holders.

Mr. Kelso's argument that every passport revocation necessarily implicates the fundamental right of citizenship cannot be reconciled with Supreme Court precedent. In *Haig v. Agee,* 453 U.S. 280, 309–10, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), the Court held that "the Government is not required to hold a prerevocation hearing," *id.* at 309, 101 S.Ct. 2766, when the Secretary of State revokes a national's passport based on a finding that the passport holder's activities threaten the national security and foreign policy of the United States. Instead, the Court concluded that: "The Constitution's due process guarantees call for no more than what has been accorded here: a statement of reasons and an opportunity for a prompt postrevocation hearing." *Id.* at 310, 101 S.Ct. 2766.

Here, as in *Agee,* the Fifth Amendment's Due Process Clause imposes on the Secretary of State nothing more than a requirement that she inform Mr. Kelso why his passport has been revoked and permit him to contest her decision promptly before a hearing officer. Constitutional liberties do not exist in a vacuum; the due process rights accorded to individuals must be carefully balanced against exigent and palpable govern-

mental interests. *Cf. Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 160, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) ("[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact."). The very purpose of 22 C.F.R. § 51.70(a)(1) is to prevent those subject to federal warrants of arrest from escaping the process of law. It would unduly frustrate the compelling interest that law-enforcement officials possess in preventing suspected felons from evading arrest if the State Department had to conduct a prerevocation hearing prior to revoking their passports.

## 2. *The Secretary Did Not Exceed Her Statutory Authority*

It is not exactly clear why Mr. Kelso believes that the Secretary exceeded her statutory authority when she decided to revoke his passport pursuant to 22 C.F.R. § 51.70(a)(1) and § 51.72(a). On the one hand, he points out that The Passport Act of 1926, 22 U.S.C. § 211a, does not expressly grant any powers of revocation to the Secretary. Yet most of his argument centers around the Ninth Circuit's opinion in *Magnuson v. Baker,* 911 F.2d 330 (9th Cir.1990), and posits that 22 U.S.C. § 2705 invalidates 22 C.F.R. § 51.70(a)(1). Neither argument, however, proves meritorious.

Simply stated, 22 U.S.C. § 2705 has absolutely nothing to do with Mr. Kelso. As explained in Subsection II.B.1, *supra,* the Secretary revoked Mr. Kelso's passport not because he was deemed a non-citizen but because he is the alleged subject of a federal warrant of arrest. The Secretary's decision to revoke his passport pursuant to 22 C.F.R. § 51.70(a)(1) and § 51.72(a) casts no pall of doubt upon the legitimacy of Mr. Kelso's citizenship. For this reason alone, *Magnuson v. Baker,* 911 F.2d 330 (9th Cir.1990), is distinguishable. Again, the issue before the Ninth Circuit in *Magnuson* differs starkly from the one before this Court. That court found that § 2705 invalidated 22 C.F.R. § 51.80 because it permitted "the Secretary to revoke a passport *on the basis of non-citizenship* without providing the passport

holder any administrative remedies." *Magnuson,* 911 F.2d at 336 (emphasis added). Because the State Department has at no point questioned Mr. Kelso's citizenship, § 2705 is plainly inapposite.

Moreover, Mr. Kelso's argument bristles with the Supreme Court's *Agee* decision. Notably absent from the Court's *Agee* opinion is any discussion of § 2705.[4] If, as Mr. Kelso maintains, § 2705 constrains the discretion that the Secretary may exercise every time she revokes a passport, it is odd that the Supreme Court ignored this great limiting principle in *Agee.* Even though the Court devoted the bulk of its opinion to whether the Secretary was authorized by statute to revoke Agee's passport based on national-security and foreign-policy concerns, one would search in vain to find a spare reference to § 2705. *See Agee,* 453 U.S. at 289–306, 101 S.Ct. 2766. Mr. Kelso makes no effort to reconcile *Agee*—much less even cite to it. Instead he relies exclusively on a case decided outside of this jurisdiction and based on a different factual record.

As noted already in Part II.A, Congress has expressly authorized the Secretary to cancel passports obtained illegally, fraudulently, or erroneously. *See* 8 U.S.C. § 1504. Moreover, § 1504 not only provides that the Secretary's decision to cancel a passport does not affect the validity of the holder's citizenship status but it also entitles the holder only to a post-cancellation hearing. *See id.* While § 1504 does not cover revocation decisions based on the issuance of a federal warrant of arrest, the statute indicates that Congress does not consider every adverse passport action to implicate a passport holder's citizenship status or trigger the right to a prerevocation hearing. Accordingly, § 2705 does not invalidate the Secretary's regulations.

Almost in passing, Mr. Kelso states that "[i]t is important to recognize that nothing in the Passport Act or any other Congressional enactment expressly grants the State Department the power to revoke passports."

---

4. Nor for that matter did the district court or the court of appeals analyze the Secretary's regulations under § 2705. *See Agee v. Vance,* 483

F.Supp. 729 (D.D.C.1980); *Agee v. Muskie,* 629 F.2d 80 (D.C.Cir.1980).

Pl.'s Reply at 2.[5] Indeed, the Passport Act of 1926, 22 U.S.C. § 211a, purports only to authorize the Secretary to "grant and issue" passports. Yet, "[p]articularly in light of the 'broad rule-making authority granted in the [1926] Act,' a consistent administrative construction of that statute must be followed by the courts 'unless there are compelling indications that it is wrong.'" *Agee*, 453 U.S. at 291, 101 S.Ct. 2766 (quoting *E.I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 55, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977)). Thus, in *Agee*, the Supreme Court found that notwithstanding the literal language of § 211a, Congress had implicitly authorized the long-standing Executive practice of revoking passports to nationals who endangered national security and foreign policy. *See id.* at 300–01, 101 S.Ct. 2766. It is, therefore, incumbent upon the Court to determine whether Congress has impliedly authorized the Secretary to revoke passports held by persons for whom federal warrants of arrest have issued.

Adopted in 1856, the first Passport Act provided that the Secretary of State "shall be authorized to grant and issue passports ... under such rules as the President shall designate and prescribe for and on behalf of the United States." 11 Stat. 60, § 23. Prior to the 1856 statute, "the common perception was that the issuance of a passport was committed to the sole discretion of the Executive." *Agee*, 453 U.S. at 293, 101 S.Ct. 2766. As the Court observed in 1835:

> There is no law of the United States, in any manner regulating the issuing of passports, or directing upon what evidence it may be done, or declaring their legal effect. It is understood, as matter of practice, that some evidence of citizenship is required, by the Secretary of State, before issuing a passport. This, however, is entirely discretionary with him.

*Urtetiqui v. D'Arcy*, 9 Pet. 692, 699, 9 L.Ed. 276 (1835).

The Supreme Court has acknowledged, however, that "while the power of the Secretary of State over the issuance of passports is expressed in broad terms, it was apparently long exercised quite narrowly." *Kent v. Dulles*, 357 U.S. 116, 127, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). Historically, the Executive exercised its discretion to refuse passports in two situations: first, questions concerning the citizenship of the applicant; and second, "whether the applicant was participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States." *Id.* Because Mr. Kelso's citizenship is not at issue, the Court focuses exclusively on the second of these historical practices.

■ The history of Executive practice, coupled with legislative intent, demonstrates that the Secretary of State possesses broad authority to revoke passports held by those subject to federal warrants of arrest. In 1903, the State Department published its *Rules Governing the Granting and Issuing of Passports in the United States*, in which it declared: "The Secretary of State has the right in his discretion to refuse to issue a passport, and will exercise this right towards anyone who he has reason to believe desires a passport to further an unlawful or improper purpose." 3 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW § 512, at 920. With language instructive to the case at bar, Secretary of State Byard wrote in 1886:

> A passport, which is the primary form and evidence of protection given to a citizen by his government, has frequently been denied to persons residing in a foreign land, in contumacy or violation of the laws of the United States. Were Winslow [Ezra D., who when discharged on habeas corpus in England, in 1876, fled, apparently to the Argentine Republic, and thus escaped extradition] merely an applicant for a passport, the fact that he is a contumacious fugitive from the justice of Massachusetts would be a sufficient reason for denying to him that evidence of the reciprocal duty of the law-abiding citizen and the obligation of his government.

3 MOORE, *supra*, § 512, at 922 (brackets in original).

5. The accuracy of this statement is somewhat suspect in light of 8 U.S.C. § 1504 (authorizing the Secretary to cancel passports obtained illegally, fraudulently, or erroneously).

More recently, Congress enacted a statute that prohibits travel abroad without a passport even in peacetime. *See* Act of Oct. 7, 1978, § 707(b), 92 Stat. 993 (codified at 8 U.S.C. § 1185(b)). As the Supreme Court has noted, 8 U.S.C. § 1185(b) "must be read *in pari materia* with the Passport Act [of 1926]." *Agee*, 453 U.S. at 300–01, 101 S.Ct. 2766. Significantly, the Senate Committee Report on the Bill clearly reflects Congress's intent to preserve the Secretary of State's discretion to revoke passports held by individuals who have been identified as subjects of arrest warrants:

> The Committee recognizes clearly that the passport authority should not be restricted in any way which would limit the President's ability to control the departure of U.S. citizens to foreign countries when such travel is inconsistent with a greater government interest, *such as preventing a citizen who is seeking to avoid the judicial processes of the United States.*

S.REP. No. 842, 95th Cong. 14 (1978) (emphasis added). The purpose that animates 22 C.F.R. § 51.70(a)(1) is to prevent travel by "a citizen who is seeking to avoid the judicial processes of the United States." In light of persuasive historical practice and recent congressional pronouncements, it is beyond peradventure that the Secretary of State is duly authorized to revoke the passports of national's who have been subjected to federal warrants of arrest.[6]

### 3. The State Department Failed to Comply with Its Own Regulations

Section 51.81 of Title 22 of the Code of Federal Regulations provides, in pertinent part:

> A person who has been the subject of an adverse action with respect to his or her right to receive or use a passport shall be entitled, upon request ... to require the

Department or the appropriate Foreign Service post, as the case may be, to establish the basis for its action in a proceeding before a hearing officer.... [T]he adverse action shall be automatically vacated unless such proceeding is initiated by the Department ... within 60 days after request, or such longer period as is requested by the person adversely affected and agreed to by the hearing officer.

22 C.F.R. § 51.81 (1997). Mr. Kelso argues that § 51.81 requires the Department to convene a hearing within sixty days of a request for a hearing. Having received no hearing within the regulatory time frame, Mr. Kelso maintains that the Secretary's revocation must be automatically vacated.

The State Department adopts a much different interpretation of § 51.81. It considers its obligation to initiate a proceeding to be discharged as soon as the Office of Passport Policy "responds to the request for the hearing." Def.'s Opp'n (Aff. of Sharon Palmer–Royston). According to the Department of State, § 51.81's command that the agency initiate a proceeding within sixty days does not "require[ ] that the hearing be *held* during the 60 day period." *Id.* (emphasis in original). Rather, Defendant avers that the regulation merely requires the Department of State to contact the requester within sixty days to discuss potential dates for the hearing. *See id.* Section 51.81, as conceived by the Department of State, prescribes absolutely no fixed deadline by which a post-revocation hearing must ultimately be held.

■ The first issue to resolve, though not raised by either party, is whether the sixty-day limitation in § 51.81 establishes a mandatory or merely directory deadline. In considering whether agencies must comply with statutorily-mandated deadlines, the Supreme Court has held that "if a statute does not

---

6. It is also worth noting that this Circuit, in dicta, observed that "[t]he decisions of the Supreme Court would permit the revocation of Agee's passport if he were indicted or otherwise charged with criminal conduct." *Agee v. Muskie*, 629 F.2d 80, 87 (D.C.Cir.1980), *rev'd on other grounds sub. nom., Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). The Circuit cited the Supreme Court's opinion in

*Kent v. Dulles*, 357 U.S. 116, 127–28, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) to substantiate its view, and specifically identified 22 C.F.R. § 51.70(a)(1) (1979) (federal warrant of arrest) as an example of a condition that would provide the Secretary of State a legitimate basis to revoke an individual's passport. *See Agee v. Muskie*, 629 F.2d at 87 & n. 10.

specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). Moreover, "the mere use of the word 'shall' in [a statute], standing alone, is not enough to remove the Secretary's power to act" after the deadline has lapsed. *Brock v. Pierce County*, 476 U.S. 253, 262, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986). Recently, this Circuit has applied the same principle to assess the mandatory nature of deadlines promulgated in regulations. *See Brotherhood of Railway Carmen Division v. Peña*, 64 F.3d 702, 704 (D.C.Cir.1995) ("An agency, after all, is presumably no more inclined than Congress to place constraints on administrative action, especially when it is its own.").

Section 51.81 satisfies the Supreme Court's test for determining whether a regulation is mandatory. The regulation not only directs the Defendant to initiate the proceeding within sixty days but it also specifies the precise consequence for failure: automatic vacation of the adverse decision. Mr. Kelso does not call upon this Court to invent its "own coercive sanction" to punish the Department of State's alleged dilatoriness, *see James Daniel*, 510 U.S. at 64, 114 S.Ct. 492. Instead, he seeks to hold the Department to the exact terms of the regulations that it promulgated.

■ Having determined that § 51.81 imposes a mandatory duty on the Department of State to "initiate" a proceeding within sixty days, the Court must now assess whether the Defendant's interpretation of its own regulation is reasonable. In undertaking this inquiry, the Court must defer to the State Department's "interpretation of its own regulations unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Freeman Eng'g Assocs., Inc. v. Federal Communications Comm'n*, 103 F.3d 169, 178 (D.C.Cir.1997) (quoting *Jersey Shore Broad. Corp. v. Federal Communications Comm'n*, 37 F.3d 1531, 1536 (D.C.Cir. 1994)). At times this degree of deference has been portrayed as even greater than that owed to agency interpretations of ambiguous statutory terms. *See, e.g., Capital Network Sys., Inc. v. Federal Communications Comm'n*, 28 F.3d 201, 206 (D.C.Cir.1994). Yet as a unanimous panel of this Circuit recently noted, "[i]n the aftermath of *Chevron*, it may be that our deference to agency interpretations of ambiguous regulations is no different than that which we afford to interpretations of ambiguous statutes." *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 584 (D.C.Cir.1997). Indeed, insofar as *Chevron* requires a court to uphold an agency's reasonable interpretation of an ambiguous statute, it would be unlikely that a court "would defer to an *unreasonable* agency interpretation of an ambiguous regulation." *Id.* Cognizant of its circumscribed role, the Court proceeds to review the State Department's interpretation.

■ The textual nub of this controversy turns on the meaning of seven words: "such proceeding is initiated . . . within 60 days." 22 C.F.R. § 51.81. Mr. Kelso argues, and the Court accepts, that "such proceeding" refers to the actual hearing before a hearing officer. The State Department suggests that "such proceeding" encompasses something broader than the actual hearing before a hearing officer. The Department points out that 22 C.F.R. § 51.85, which sets forth the mechanics of the "proceedings before the hearing officer," provides that a hearing officer may accept affidavits and order depositions for absent witnesses. From this, the Department of State somehow reasons that if a hearing officer's order to conduct depositions or agree to accept affidavits constitutes a part of the proceedings, then the Department's preliminary response to a request for a hearing must also constitute part of the proceedings.

This interpretation is plainly erroneous. The first sentence of § 51.81 vests a passport holder with the right to contest the Department of State's revocation "in a proceeding before a hearing officer." 22 C.F.R. § 51.81. The regulation's third sentence provides that the adverse action "shall be automatically vacated unless *such proceeding* is initiated by the Department . . . within 60 days after request." *Id.* (emphasis added). By employing the reflexive "such" to modify which

"proceeding" the Department must initiate, the third sentence unambiguously refers to the first sentence's "proceeding before a hearing officer." It is a cardinal canon of statutory construction that "in construing a statute we are obliged to give effect, if possible, to every word that Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Similarly, statutes should not be interpreted as to make a provision "either superfluous or meaningless." *Benavides v. DEA*, 968 F.2d 1243, 1248 (D.C.Cir.1992).[7] To adopt the Department's interpretation of "proceeding" would be to eschew the word "such" from § 51.81. Although the Department of State is entitled to great deference, "such deference is appropriate only when the meaning of the words used is 'doubtful or ambiguous.'" *CSX Transp., Inc. v. Surface Transportation Bd.*, 75 F.3d 696, 702 (D.C.Cir.1996) (quoting *American Train Dispatchers Ass'n v. ICC*, 54 F.3d 842, 848 (D.C.Cir.1995)). It is clear that the proceeding that the Department of State must initiate within sixty days under 22 C.F.R. § 51.81 is the "proceeding before a hearing officer" that is described in the section's first sentence.

Having determined that the hearing before a hearing officer is the direct object of the verb "initiate," it is now incumbent upon the Court to determine whether the Department of State's interpretation of what it means "to initiate" the hearing is plainly erroneous or inconsistent with the regulation. By its account, "[t]he Department does not consider that the regulation requires that the hearing be *held* during the 60 day period." Def.'s Opp'n (Aff. of Sharon Palmer–Royston) (emphasis in original). Instead, the Defendant interprets its obligation to initiate the proceeding before a hearing officer to be discharged once the Department simply "responds to the request for the hearing." *Id.* A necessary corollary of the Department's interpretation is that § 51.81 sets absolutely no deadline by which the Department must actually conduct a hearing. So long as within sixty days after a request for a hearing the Department of State dispatches a letter to the passport holder in which it offers to negotiate future hearing dates, the Defendant argues that it has initiated a proceeding before a hearing officer. Under the Department's interpretation, the regulation is indifferent as to whether the hearing is actually convened within sixty days or six months.

The Department of State's interpretation of the word "initiate" "is so far removed from any established definition of that word that we must reject its interpretation as plainly erroneous." *C.F. Communications Corp. v. Federal Communications Comm'n.*, 128 F.3d 735, 739 (D.C.Cir.1997). The Oxford English Dictionary defines "initiate" to mean: "To begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.)." 7 THE OXFORD ENGLISH DICTIONARY 977 (2d ed.1989). Mr. Webster offers a similar definition: "[T]o begin or set going: make a beginning of: perform or facilitate the first actions, steps, or stages of: establish as an institution, custom, or trend." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1164 (3d ed.1976). Finally, to determine whether the legal community recognizes a peculiar definition of "initiate" not generally adopted by laypersons, the Court turns to Black's Law Dictionary: "Commence, start; originate; introduce; inchoate." BLACK'S LAW DICTIONARY 705 (Special Deluxe 5th ed.1979). These definitions underscore the plain error of the Department's interpretation. To "initiate" the proceeding before the hearing officer, the Department must "begin" or "commence" the hearing within sixty days of receiving a request. In turn, to begin or to commence mandates something more than merely responding to a passport holder's request for a hearing. When analyzed even under the most charitable definition of "initiate"—which this Court feels compelled to do in light of the broad deference owed federal agencies—the Department of State's interpretation fails. To "perform or facilitate the first actions, steps, or stages of" the proceeding may, in fact, encompass something short of actually commencing the hearing. Indeed,

---

7. The Court recognizes, of course, that the provision at issue emanates not from a statute but from a regulation. Nonetheless, the principles embodied in these canons of statutory interpretation are certainly instructive in attempts to divine reasonable interpretations of agency regulations.

22 C.F.R. § 51.85 provides that a hearing officer may "order evidence to be taken by deposition" when witnesses are unavailable. Such a discovery order could plausibly constitute "the first action, step, or stage" of the hearing, notwithstanding the fact that the hearing itself may not begin within sixty days. Yet "initiate" is not so elastic as to permit the Department of State to stretch its meaning to accommodate any interpretation it conceives of. As this Circuit has noted in other contexts, although a word may not have a precise, fixed definition, "this fact does not convert the word into a sort of Rorschach test, permitting the [Department] to read into the word anything it pleases." *C.F. Communications Corp.*, 128 F.3d at 739. Even though § 51.81 is captioned, "Time limits on hearing to review adverse action," the Department's unprincipled interpretation would produce a rather curious result: So long as it responded to a request for a hearing within sixty days, it could wait six months or longer before eventually holding the actual hearing. Accordingly, Mr. Kelso has demonstrated a particularly strong likelihood of succeeding on the merits of his claim that the Department failed to initiate a proceeding within sixty days as required by 22 C.F.R. § 51.81.

Moreover, because regulations, like statutes, should not be interpreted as to make a provision "either superfluous or meaningless," *Benavides v. DEA*, 968 F.2d 1243, 1248 (D.C.Cir.1992), the Department's interpretation must be rejected. The Defendant's understanding of "initiate" renders superfluous the last portion of § 51.81. That clause provides that the Department must initiate the proceeding within sixty days from receipt of a request "or such longer period as is requested by the person adversely affected and agreed to by the hearing officer." 22 C.F.R. § 51.81. Why a passport holder would ever request more time for the Department merely to respond to his or her request for a hearing is puzzling. This peculiar quandary vanishes when "initiate" is defined as "to commence" or "to begin." Certainly, a passport holder may

have strong reasons to postpone the hearing beyond the sixty-day deadline. Because the Department's interpretation would render § 51.81's last clause meaningless, the Court rejects it as plainly erroneous. Accordingly, Plaintiff has made a strong showing of likelihood of success on the merits.

Finally, to sanction the Department's novel interpretation of § 51.81 would be to emasculate the due-process concerns that animated the Department to promulgate initially the regulation. In *Bauer v. Acheson*, 106 F.Supp. 445 (D.D.C.1952), a three-judge panel of this Court held that the Department of State acted without legal authority when it revoked a plaintiff's passport without notice and an opportunity to be heard. *See id.* at 451–52. The Court, however, carefully qualified its holding by noting that it was "not suggest[ing] that the Secretary of State is without authority to establish reasonable classifications of persons whose passports shall be revoked or not renewed." *Id.* at 452. Although unwilling to subscribe to a view of plenary Executive authority over passport decisions, the Court concluded that, "like other curtailments of personal liberty for the public good, the regulation of passports must be administered, not arbitrarily or capriciously, but fairly, applying the law equally to all citizens without discrimination, and with due process adapted to the exigencies of the situation." *Id.* It has been noted that "less than two months [after the *Bauer* decision] and presumably as a result of that decision, the Secretary promulgated the regulations . . . establishing a notice and hearing procedure." *Briehl v. Dulles*, 248 F.2d 561, 579–80 (D.C.Cir.1957) (Bazelon, J., dissenting), *rev'd sub nom. Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).[8] The due-process concerns that this Circuit expressed in *Bauer*, and to which the Secretary of State presumably responded when he promulgated corresponding regulations, turned on the opportunity to be heard during a "procedure in which the elements of fair play are accorded." *Bauer*, 106 F.Supp. at 451. It is unreasonable to believe that the Depart-

---

**8.** The regulations before the Circuit in *Briehl* were the precursor to the Department's current regulations codified in Title 22 of the Code of Federal Regulations. *See* 17 Fed.Reg. 8013, Sept. 4, 1952, 22 C.F.R. §§ 51.135–51.143 (1957 Supp.).

ment of State's contemporaneous response to the *Bauer* decision reflected a view that due process was satisfied by simply responding to inquiries for a hearing.[9]

### C. Other Factors To Consider in Granting Preliminary, Injunctions,

■ Mr. Kelso, having demonstrated a "particularly strong showing on the merits," may be entitled to a preliminary injunction even if the arguments in the other three areas "are rather weak." *CityFed Fin. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995). As for Mr. Kelso's irreparable injury, the Department's revocation decision has undoubtedly curtailed his right to travel, which "is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 125, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). While, of course, this right is not absolute, *see Haig v. Agee*, 453 U.S. 280, 309–10, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), continual infringement without a due-process hearing constitutes "at least 'some injury.'" *Id.* (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986)).[10]

The potential injury to others and the public interest does not weigh strongly in Mr. Kelso's favor. Of course, on the one hand, "the public may be deemed to have an overriding interest in assuring that the government remains within the limit of its constitutional authority." *National Treasury Employees Union v. United States Dep't of Treasury*, 838 F.Supp. 631, 640 (D.D.C.1993); *see also American Jewish Congress v. Vance*, 575 F.2d 939, 944 (D.C.Cir.1978) (holding that, although too remote to confer standing on citizens, "the proper observance of constitutional limitations by government officials is an interest shared by all members of the American public"). On the other hand, Mr. Kelso has been indicted allegedly by a federal court on serious criminal charges of fraud and money laundering, and the FBI believes that he represents a serious flight risk. To grant a preliminary injunction that would compel the Department of State to vacate its earlier revocation of Mr. Kelso's passport could damage severely the interest shared by the public and government alike in preventing the subjects of federal arrest warrants from fleeing. Nonetheless, this must be balanced against Plaintiff's particularly strong showing on the merits of his claim that the Department's own regulations compel it to vacate its revocation decision. Moreover, it must be remembered that 22 C.F.R. § 51.81 only requires the Department "to vacate" its previous revocation decision. It may very well be the case that the Department of State will choose to re-revoke Mr. Kelso's passport immediately upon returning it to him. This issue, however, is not ripe nor was it briefed by the parties, and the Court intimates no opinion as to the authority that the Department may possess to take such action.

### III. CONCLUSION

After carefully weighing the four variables, the Court concludes that Mr. Kelso has dem-

---

9. Congressional legislation also implicitly refutes the reasonableness of the Department's interpretation. As the Defendant itself has noted, 8 U.S.C. § 1504 explicitly grants the Secretary of State the power to cancel passports obtained illegally, fraudulently, or erroneously. The statute, moreover, requires the Department merely to hold a post-cancellation hearing. Importantly, however, Congress directs the Department to establish "procedures for seeking a *prompt* post-cancellation hearing." *Id.* (emphasis added). Admittedly, § 1504 does not, on its face, govern 22 C.F.R. § 51.81. Yet it does, as Defendant has argued in other contexts, reflect Congress's understanding of the Secretary of State's power to regulate passports. Accordingly, the Department's interpretation of § 51.81, which would presumably permit the Department to hold a

hearing six months after a request, seems to contradict congressional intent.

10. The Court notes that British authorities possessed the Plaintiff's passport at the time the State Department notified Mr. Kelso of its revocation decision. The parties currently dispute whether the British government retains an interest in Mr. Kelso's passport. *See* Mot. Hr'g, Apr. 23, 1998, at 31:17–:24. As explained later in this Memorandum Opinion, the purpose of injunctive relief in this case is to return the parties to the status quo ante. Accordingly, the Court shall direct the State Department to return the passport to the British government; and leave to that sovereign the right to determine whether it actually has a continuing interest in retaining the Plaintiff's passport.

**12**

onstrated a particularly strong likelihood of success on the merits of his claim that the Department of State violated 22 C.F.R. § 51.81. While Mr. Kelso's other arguments are not as strong, the Court finds that, on balance, the equities weigh in favor of granting preliminary injunctive relief. Accordingly, the Department of State shall be ordered to vacate its January 27, 1998 decision to revoke Mr. Kelso's passport. Because the purpose of a preliminary injunction is to preserve the status quo ante, the Department of State shall be further ordered to return Mr. Kelso's passport to the British authorities who possessed it prior to the revocation decision.

An Order accompanies this Memorandum Opinion.

### ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is, this 29 day of April 1998, hereby

**ORDERED** that Plaintiff's Motion for Preliminary Injunction shall be, and hereby is, **GRANTED;** and it is

**FURTHER ORDERED** that the Defendant shall vacate its January 27, 1998 decision to revoke Plaintiff Joseph Robert Kelso's passport (# 033549178); and it is

**FURTHER ORDERED** that Defendant shall return Plaintiff Joseph Robert Kelso's passport (# 033549178) to the British authorities who last possessed it.

**SO ORDERED.**