Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 20, 2004          Decided April 30, 2004

No. 02-1364

COMMUNICATIONS VENDING CORPORATION OF ARIZONA, INC., ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

ABTEL COMMUNICATIONS, INC., ET AL.,
INTERVENORS

———

Consolidated with
03–1010, 03–1012

———

On Petitions for Review of an Order of the
Federal Communications Commission

———

*Katherine J. Henry* argued the cause for IPP petitioners. With her on the briefs was *Albert H. Kramer.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

2

*Aaron M. Panner* argued the cause for LEC petitioners. With him on the briefs were *Michael E. Glover*, *Edward H. Shakin*, *John M. Goodman*, and *Gary L. Phillips*.

*Michael J. Thompson* was on the brief for intervenors ABTEL Communications, Inc., et al. in support of PSP petitioners.

*Richard K. Welch*, Counsel, Federal Communications Commission, argued the cause for respondents. On the brief were *Robert H. Pate III*, Assistant Attorney General; *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys; *John A. Rogovin*, General Counsel, Federal Communications Commission; *John E. Ingle*, Deputy Associate General Counsel; and *Laurel R. Bergold*, Counsel.

*Albert H. Kramer* argued the cause for IPP intervenors in support of respondents. With him on the brief was *Katherine J. Henry*.

*Aaron M. Panner* argued the cause for LEC intervenors in support of respondents. With him on the brief were *Michael E. Glover*, *Edward Shakin*, *John M. Goodman*, and *Gary L. Phillips*.

Before: SENTELLE, RANDOLPH, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In these consolidated cases, we consider challenges to the Federal Communications Commission's ruling that local telephone companies unreasonably imposed certain end-user charges on independent payphone providers from 1986 to 1997. One set of petitioners, local telephone companies, argues that the Commission had no basis for finding them liable. Another set of petitioners, independent payphone providers, challenges the Commission's application of the Communications Act's statute of limitations to limit their recovery to charges paid during the two years prior to the filing of their complaints. Concluding that both decisions are consistent with law and neither arbi-

trary nor capricious, we affirm the Commission in all respects.

## I.

This dispute between local telephone companies (known as local exchange carriers or LECs) and independent payphone providers (IPPs) has a long pedigree in this court. Two prior opinions describe the background in detail. *See Verizon Tel. Cos. v. FCC*, 269 F.3d 1098 (D.C. Cir. 2001); *C.F. Communications Corp v. FCC*, 128 F.3d 735 (D.C. Cir. 1997).

The history begins in 1983, when the Commission issued access charge rules authorizing LECs to recover certain non-traffic sensitive costs (such as the cost of installing phone lines) through flat monthly charges called End User Common Line (EUCL) charges. *In re MTS and WATS Market Structure, Third Report and Order*, 93 F.C.C.2d 241, 242–43 (1983), *modified on recons.*, 97 F.C.C.2d 682 (1983) (*Access Charge Recons.*), *modified on further recons.*, 97 F.C.C.2d 834 (1984), *aff'd in part and remanded in part sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984). Under those rules, LECs could assess EUCL charges only on "end users," defined by the Commission's rules as "any customer of . . . telecommunications service . . . [or] a person or entity that offers telecommunications services exclusively as a reseller . . . if all resale transmissions . . . originate on the premises of such reseller." 47 C.F.R. § 69.2(m) (2003).

Of particular significance to the issue we face here, the access charge rules applied differently to public and semi-public payphone service. The Commission explained: "A pay telephone is used to provide *public* telephone service when a public need exists, such as at an airport lobby, at the option of the telephone company and with the agreement of the owner of the property on which the phone is placed." *Access Charge Recons.*, 97 F.C.C.2d at 704 n.41 (emphasis added). By contrast, "[a] pay telephone is used to provide *semipublic* telephone service when there is a combination of general public and specific customer need for the service, such as at a

gasoline station or pizza parlor." *Id.* at 704 n.40 (emphasis added). Because end users of public payphones are the transient general public, rather than identifiable subscribers, the Commission's rules exempted public payphone service from EUCL charges and instead allowed LECs to recover public payphone costs from long distance carriers. *See id.* at 705, ¶ 58. Semi-public payphone service, however, was subject to EUCL charges because the LECs' "fixed costs [could] be recovered from an identifiable business end user through flat charges." *Id.* at 706, ¶ 60.

At the time the Commission issued its access charge rules, all payphones were owned and operated by LECs. In 1984, the Commission allowed IPPs to enter the market and compete with LEC payphones. Because the access charge rules were established at a time when only LECs provided payphone service, the rules said nothing about how EUCL charges would apply to IPP-owned payphones. Acting entirely on their own, however, the LECs began assessing EUCL charges on all IPP payphones, both public and semi-public, as soon as IPPs entered the market. The IPPs objected, and in 1989 their trade association filed a petition with the Commission challenging the lawfulness of the charges. Also in 1989, one IPP, C.F. Communications Corporation (CFC), filed a complaint with the Commission, arguing that its payphones should be exempt from EUCL charges because it was not an "end user" and because it provided public payphone service.

Denying CFC's complaint, the Commission ruled that the LECs had properly assessed EUCL charges under the access charge rules. CFC, the Commission explained, met the regulatory definition of "end user" because it was a "reseller" whose resale transmissions "originate[d] on [its] premises." *In re C.F. Communications Corp. v. Century Tel. of Wisc., Inc.*, 10 F.C.C.R. 9775, 9778–79, ¶¶ 12–17 (1995) (quoting 47 C.F.R. § 69.2(m)) (internal quotation marks omitted). The Commission also found that CFC's payphones were not "public telephones" but rather semi-public payphones subject to EUCL charges. *See id.* at 9779–80, ¶¶ 20–21. Relying on

that order, the Commission denied complaints filed by several other IPPs challenging the imposition of EUCL charges.

In *C.F. Communications v. FCC,* however, we reversed the Commission's CFC decision, concluding that the Commission "erred in determining that CFC was an 'end user' " within the meaning of its rules. 128 F.3d at 740. We found "the Commission's interpretation of the word 'premises,' " a "real property" term, to encompass IPP payphones, items of "personal property," to be "so far removed from any established definition of that word" that it was "plainly erroneous." *Id.* at 739. We also found the Commission's decision "not reasoned" because by permitting EUCL charges on IPP-owned but not LEC-owned public payphones even though both provided indistinguishable telephone service, the Commission "improperly discriminated between similarly situated phone services without a rational basis." *Id.* at 740.

Following our lead, the Commission reversed itself on remand, concluding that the LECs had imposed an unreasonable charge in violation of agency regulations and 47 U.S.C. § 201(b) (2000), which requires that charges for communications services be "just and reasonable." *See In re C.F. Communications Corp. v. Century Tel. of Wisc., Inc.*, 15 F.C.C.R. 8759, 8768, ¶ 24 (2000) (*CFC Remand Order*). According to the Commission, "CFC and the other IPPs [could not] be considered 'end users' " under the definition of that term because they owned the payphones but not the "premises" from which payphone calls were made. *Id.* The Commission went on to state, however, that "irrespective of whether CFC was an 'end user,' . . . the primary determination the Commission should have made was whether CFC's payphones were 'public' or 'semi-public.' " *Id.* at 8768, ¶ 25. Viewing the rules this way, the Commission concluded that LECs had unreasonably imposed EUCL charges on IPP public payphones. *See id.* at 8766, ¶ 20.

The LECs then petitioned for review, arguing that liability was unfounded because they had acted in reliance on the Commission's prior ruling approving the charges. Observing that the Commission's decision was "under unceasing chal-

lenge before progressively higher legal authorities" until ultimately being overturned in *C.F. Communications*, we upheld the Commission. *Verizon*, 269 F.3d at 1110.

In the meantime, following *C.F. Communications*, IPPs that had not participated in those proceedings filed some 3000 informal complaints with the Commission seeking damages for the LECs' imposition of EUCL charges from the time IPPs entered the payphone market until 1997, when the Commission revised its access charge rules to require "the prospective application of EUCL charges to both independent payphones and to LEC-owned payphones." *C.F. Communications*, 128 F.3d at 738 (emphasis omitted). Thirteen of those complaints, filed in late 1997 and early 1998, are the subject of this case. In their complaints, the IPPs alleged that the LECs' imposition of EUCL charges violated section 201(b) because the IPPs were not end users, irrespective of whether their payphones were public or semi-public. After bifurcating the proceedings and deferring the calculation of damages to a later phase, the Commission issued the liability order now on review, granting the IPPs' complaints in part. *See Communications Vending Corp. of Ariz. v. Citizens Communications Co.*, 17 F.C.C.R. 24,201 (2002) (*Order*). For reasons explained further in each section below, the Commission concluded that (1) because the IPPs were not end users under Commission regulations, they were not subject to EUCL charges for either their public or their semi-public payphones, and (2) because the IPPs' cause of action accrued when they incurred EUCL charges, the Communications Act's statute of limitations barred them from recovering charges paid more than two years before they filed their complaints. *See id.* at 24,208, ¶ 15.

Both the LECs and the IPPs now challenge the Commission's order. The LEC petitioners dispute the finding of liability, while the IPP petitioners argue that the statute of limitations does not limit their recovery. Each group of petitioners has intervened on behalf of the Commission to oppose the other group's petition, and additional IPPs, whose complaints before the Commission were stayed pending resolution of this proceeding, *see id.* at 24,206, ¶ 11, have inter-

vened in support of the IPP petitioners. We address the LECs' arguments in part II and the IPPs' in part III.

## II.

The Commission found that "because [the IPPs] were not 'end users' within the meaning of [its regulations], they were not within the scope of the EUCL rule, and charges levied against them—regardless of whether the payphones were public or semi-public—were unlawful." *Id.* at 24,209, ¶ 19. In so ruling, the Commission rejected the LECs' argument that because the IPPs were acting as agents of the owners of the premises on which their payphones were located, EUCL charges were reasonable. *See id.* at 24,211, ¶ 24. The Commission explained that as to public payphones, whether the IPPs were acting as agents was irrelevant because under the access charge rules public premises owners were exempt from EUCL charges. *See id.* at 24,211–12, ¶ 25. In any event, as to both public and semi-public payphones, the Commission concluded that the LECs "ha[d] established no basis for imputing any liability of the premises owner" to the IPPs. *Id.* at 24,212, ¶ 26. According to the Commission, neither the written agreements nor the circumstances of the payphone service arrangements detailed in the record subjected the IPPs to the premises owners' control. To the contrary, the Commission found that the IPPs paid the owners for the use of their space and, although the IPPs needed authorization to install the payphones, they maintained the phones at their own discretion and in their own interests.

In reviewing the LECs' challenges to the Commission's order, we follow familiar principles of administrative law, affirming the Commission's conclusions of law unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (2000), and accepting its findings of fact so long as they are supported by substantial evidence on the record as a whole, *see, e.g., AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996). We give "controlling weight" to the Commission's interpretation of its own regulations "unless it is plainly erroneous or inconsistent

with the regulation." *Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 206 (D.C. Cir. 1994).

The LECs challenge the Commission's liability determination on two grounds. First, they argue that the Commission erred in holding that because IPPs were not end users they were exempt from EUCL charges on their semi-public payphones. During the period at issue the FCC regulation establishing EUCL charges stated that "[a] charge . . . shall be assessed upon end users that subscribe to local exchange service . . . or semi-public coin telephone service." 47 C.F.R. § 69.104(a) (1996). Thus, as the Commission explained, "[u]nder the plain language of the rule" only end users were subject to EUCL charges. *Order*, 17 F.C.C.R. at 24,209–10, ¶ 20. As mentioned above, section 69.2(m) defined "end user" as:

> [A]ny customer of an interstate or foreign telecommunications service that is not a carrier except that a carrier other than a telephone company shall be deemed to be an 'end user' when such carrier uses a telecommunications service for administrative purposes and *a person or entity that offers telecommunications services exclusively as a reseller shall be deemed to be an 'end user' if all resale transmissions offered by such reseller originate on the premises of such reseller.*

47 C.F.R. § 69.2(m) (emphasis added). Expressly following *C.F. Communications*'s reasoning, which it had adopted in the *CFC Remand Order*, the Commission again found that the IPPs here, like CFC, were not end users under that definition because, although they were resellers of telecommunications services, they did not own the premises from which the payphone transmissions originated. *See Order*, 17 F.C.C.R. at 24,210–11, ¶¶ 21–22.

We see nothing unreasonable in the Commission's analysis. Indeed, largely ignoring the regulations' language and the well-established precedent on which the Commission relied, the LECs essentially contend that the Commission got it right in the *CFC Remand Order*, which concluded that LECs

were liable only for EUCL charges assessed on IPP public payphones. Citing *C.F. Communications*, they argue first that the Commission erred by applying section 69.2(m)'s definition of end user to the assessment of EUCL charges on IPP payphones, claiming it was "adopted in a different context." LEC Pet'rs' Br. at 19. In *C.F. Communications*, however, we did not find the end-user definition inapplicable to the IPP payphone context, but rather remanded the case so that the Commission could correct its erroneous interpretation of section 69.2(m)'s definition with respect to IPP payphones. Indeed, throughout the history of these proceedings, the petitioners, the Commission, and this court have looked to that end-user definition to evaluate the assessment of EUCL charges on IPPs, and the LECs offer no reason why it was unreasonable for the Commission to continue to do so here.

The LECs next charge that the Commission inadequately explained its change in position from the *CFC Remand Order*. We disagree. Recognizing that making LEC liability turn on IPP end-user status deviated from its prior decision, the Commission provided a "thorough review of the relevant rules and precedents" before "conclud[ing] that [its] prior focus on the public/semi-public distinction, rather than the threshold end user determination, was incorrect." *Order*, 17 F.C.C.R. at 24,212, ¶ 22. The Commission explained that because of its focus on that distinction, it had previously determined that IPPs were not end users but that it had never before addressed the IPPs' argument about the consequences of that determination in view of the fact that section 64.104 made clear that EUCL charges could be assessed on end users only. *See id.* at 24,212, ¶ 23 (explaining that "a charge that may be levied only on 'end users' may [not] be assessed upon entities that explicitly have been found not to be end 'users'"). This is more than sufficient to provide the "reasoned explanation" we require of an agency that changes its position. *See Amax Land Co. v. Quarterman*, 181 F.3d 1356, 1365 (D.C. Cir. 1999).

The LECs' other arguments on this score rest on a misreading of the Commission's order. They claim that by

holding that a premises owner "that ordered semi-public payphone service from [a LEC] was liable for the EUCL charge" while a premises owner ordering the same service from an IPP "enjoyed an access charge exemption," the Commission ignored the access charge policy of "recovery of costs from an identifiable subscriber" and "create[d] precisely the type of unreasonable discrimination that prompted this court to grant the petition for review in *C.F. Communications*." LEC Pet'rs' Br. at 16–17. But as the Commission points out, its order "states only that the IPPs were not subject to the EUCL charges," and does not consider "whether the identifiable end users (*i.e.*, premises owners) of IPP-owned semi public payphones . . . would have been liable for EUCL charges." Resp'ts' Br. at 32 (emphasis omitted). Thus, the Commission's determination that IPPs were not end users with respect to their semi-public payphones does not run counter to the access charge rules that authorized LECs to collect EUCL charges from identifiable subscribers who qualified as end users of IPPs' semi-public payphones. Indeed, given that LECs paid no EUCL charges on their *own* semi-public payphones, but rather imposed them on premises owners receiving their semi-public payphone service, the Commission's order treats competing IPPs in precisely the same way. Therefore, unlike in *C.F. Communications*, the Commission's revised interpretation of its rules does not treat similar payphone services differently. It was the LECs who chose to assess EUCL charges on their IPP competitors rather than on those premises owners who may have qualified as identifiable end users. Thus, any disparate treatment of semi-public payphone services stems from the LECs' actions, not from the Commission's ruling.

For their second line of attack, the LECs contend that even if end-user status is determinative, they properly assessed EUCL charges on both public and semi-public payphone service because the IPPs were serving as agents of the premises owners who, according to the LECs, were end users subject to EUCL charges under the Commission's regulations, i.e., premises owners were "customer[s] of . . . telecommunications service," 47 C.F.R. § 69.2(m), that "subscribe[d]

to local exchange telephone service." 47 C.F.R. § 69.104(a). Like the Commission, however, we fail to see how the existence of any such agency relationship could matter for *public* payphone service. The Commission's determination that the LECs "cannot use an agency theory to avoid liability for EUCL charges assessed on public payphones," *Order*, 17 F.C.C.R. at 24,211, ¶ 25 (emphasis omitted), follows directly from its regulations and controlling precedent. As the Commission explained, its access charge rules, *C.F. Communications*, and the *CFC Remand Order* all clearly established that " 'end users' of public payphones are *exempt* from the EUCL charges," *id.*—an exemption that applies with equal force to IPP- and LEC-owned payphones. Under those rules and precedents, premises owners having IPPs' *public* payphones were not subject to EUCL charges because the owners were not "end users" who "subscribe[d]" to local telephone service. For public payphones, the transient general public, not the public premises owner, was the end-user, and although IPPs providing public payphones may have subscribed to local exchange service, public premises owners did not. In other words, as the Commission reasonably concluded, because "the premises owners [of IPPs' public payphones] would not have been subject to EUCL charges," whether IPPs were agents of the public premises owners is irrelevant. *Id.*

The agency issue may well have relevance with respect to semi-public payphone service, which *was* subject to EUCL charges, but the Commission found that the LECs had "established no basis for imputing any liability of the premises owner" to the IPPs. *Id.* at 24,212, ¶ 26. Challenging that finding, the LECs contend that the Commission ignored record evidence showing that the IPPs acted—or at least led the LECs to believe they were acting—as the premises owners' agents in ordering local telephone service. We disagree. Reviewing the written agreements between the IPPs and the premises owners, the parties' roles under those agreements, and other record evidence, the Commission found that the IPPs were acting as licensees of the premises owners, not as agents allegedly liable for EUCL charges. Although recognizing that the IPPs needed the premises

owners' consent before ordering service, the Commission determined that this did not establish an agency relationship given that, in each case, the IPPs compensated the premises owners for that authorization and had sole discretion over the number of lines to install. *See id.* at 24,212–13, ¶¶ 28–29. Thus, the Commission found that the IPPs were acting in their own interests free from the premises owners' control.

The LECs insist that the agency relationship is "particularly clear in the case of semi-public payphones," where the "premises owner itself has a 'specific ... need' for the payphone" and the IPP orders "service on the premises owner's behalf so that the premises owner would have continuing access to semi-public payphone service." LEC Pet'rs' Br. at 24–25. It is true that the Commission's rules suggest that the relationship between IPPs and premises owners would likely have differed in the semi-public context:

> Semi-public payphones tend to be payphones placed in locations, at the request of the premises owner, that do not generate significant amounts of traffic. The [company] providing the semi-public payphone typically receives the coin revenues from the payphone, as well as a monthly fee discounted from the rate for a business line.

*In re Implementation of the Pay Tel. Reclassification & Compensation Provisions of the Telecomms. Act of 1996*, 11 F.C.C.R. 20,541, 20,680 n.912 (1996) (citation omitted). Even if such a relationship were sufficient to establish agency, however, the LECs point to nothing in the record demonstrating that any of the IPP petitioners actually had such a relationship with premises owners. Although we understand that the Commission deferred the question of whether the IPPs' payphones were public or semi-public to the damages phase, *see Order*, 17 F.C.C.R. at 24,211 n.73, we think the Commission correctly put the burden of proving an agency relationship on the LECs, for it was they who asserted agency as a defense in the liability phase, *see id.* at 24,212, ¶ 27; *see also Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994); 12 *Williston on Contracts* § 35:2 (4th

ed. 2003) ("As a general rule, the party asserting the agency relationship has the burden of proving both the existence of the relationship and the authority of the agent."). On this record, the Commission correctly concluded that the LECs failed to carry that burden because they had offered insufficient evidence of an agency relationship between the IPPs and the premises owners that could have supported their claim of imputed liability. Moreover, nothing in the record supports the LECs' argument that the IPPs somehow misled them; indeed, given that the LECs were themselves involved in similar transactions, we find it difficult to accept the notion that they could have been confused about the nature of the IPP-premises owner relationship.

### III.

This brings us to the IPPs' challenge to the Commission's application of the statute of limitations to limit their recovery of damages. Section 415 of the Communications Act provides: "All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after . . . ." 47 U.S.C. § 415(b) (2000). Citing judicial and Commission precedent, the Commission explained that a cause of action under section 415 accrues on the date of injury, or if the injury is not readily discoverable, at the time the complainant should have discovered it. *Order*, 17 F.C.C.R. at 24,222, ¶ 51. Based on the IPPs' representation that they were aware of the charges when assessed, believed them to be unlawful, and knew that other IPPs had challenged them, the Commission held that the injury occurred and the cause of action accrued when the IPPs "received their first bill containing the EUCL assessment." *Id.* at 24,223, ¶ 51. The Commission rejected the IPPs' theory that their cause of action did not accrue until the unlawfulness of the charges was clearly established. *See id.* at 24,223, ¶ 52. The Commission also declined to toll the statute of limitations, finding that the IPPs had failed to act with due diligence. *See id.* at 24,226–27, ¶¶ 58–63. Applying the two-year limitation period, the Commission concluded that the

IPPs could recover damages for only the two-year period preceding the filing of their complaints. *See id.* at 24,227, ¶ 64.

We review the Commission's interpretation of section 415 in accordance with the familiar principles of *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *See Cellco P'ship v. FCC*, 357 F.3d 88, 94 (D.C. Cir. 2004). Because Congress did not define the term "accrues," we must determine whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In construing section 415, the Commission relied on its long held view that "a cause of action accrues at the time the carrier does the unlawful act." *In re MCI Telecomms. Corp. v. US West Communications, Inc.*, 15 F.C.C.R. 9328, 9330, ¶ 5 (2000). Thus, "[i]n cases involving allegations that a carrier has failed to charge a just and reasonable rate . . . , the general rule is that the two-year limitations period begins to run when the customer receives a bill from the carrier assessing the disputed rate." *Id.*

The IPPs insist that "[e]xisting law does not support the Commission's accrual ruling" because "a cause of action cannot accrue when the controlling law does not recognize its validity." IPP Pet'rs' Br. at 13, 15. In making this argument, however, they point to nothing in section 415's language or legislative history either to support their interpretation or to suggest that the Commission's reading is unreasonable. Instead, the IPPs rely on a line of cases unrelated to section 415 that originates with the Fifth Circuit's decision in *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353 (5th Cir. 1972). In that case, a taxpayer sued to recover property forfeited as a result of gambling and tax violations. Rejecting the argument that the claim was barred by the six-year statute of limitations, the Fifth Circuit held that the taxpayer's cause of action did not accrue until the date of an intervening Supreme Court ruling, which established a new defense to such forfeiture proceedings and expressly endorsed the retroactive application of that new rule. In delaying the accrual of the taxpayer's cause of action, the Fifth Circuit

explained that the taxpayer had "no reasonable probability of successfully prosecuting his claim against the government prior to the enunciation of the new . . . rule." *Id.* at 1358. Applying *Red Chevrolet* to the circumstances here, the IPPs argue that they had no cause of action until our 1997 decision in *C.F. Communications* because, until then, they had no reasonable probability of success.

While the IPP's theory is certainly interesting, *Red Chevrolet* arose under a different statute entirely—the Tucker Act— and therefore has nothing to do with the question before us: whether the FCC's interpretation of section 415 is reasonable. Not only do we see nothing in the statute that suggests otherwise, but the FCC's view is consistent with prevailing caselaw. To determine when a cause of action accrues under section 415, this circuit, as well as every other circuit to have addressed the issue, has applied the "discovery of injury" rule—the general accrual rule for remedial civil actions. *See MCI Telecomms. Corp. v. FCC*, 59 F.3d 1407, 1417 (D.C. Cir. 1995); *see also MCI Telecomms. Corp. v. Teleconcepts*, 71 F.3d 1086, 1100 (3d Cir. 1995); *Pavlak v. Church*, 727 F.2d 1425, 1428 (9th Cir. 1984). Under that rule, a cause of action accrues either when a readily discoverable injury occurs or, if an injury is not readily discoverable, when the plaintiff should have discovered it. *MCI Telecomms. Corp.*, 59 F.3d at 1417.

In other contexts, moreover, we have rejected *Red Chevrolet*'s reasoning and the IPPs' argument that a cause of action does not accrue until uncertain law becomes settled. In *Atchinson, Topeka & Santa Fe Ry. Co. v. ICC*, 851 F.2d 1432 (D.C. Cir. 1988), we reversed an Interstate Commerce Commission ruling that a shipper's cause of action seeking refunds of unlawfully paid delivery fees did not accrue at the time of the delivery (as required by the statute at issue), but rather years later when the ICC resolved unsettled law about such refund claims. Calling the ICC's action "as extraordinary as it was unwarranted," we rejected that agency's delayed accrual approach in favor of traditional equitable tolling analysis. *Id.* at 1437; *see also Aluminum Co. of Am. v. United States*, 867 F.2d 1448, 1453 (D.C. Cir. 1989) (rejecting the argument

that a cause of action did not accrue until our precedent resolved the question of available remedies).

Given the foregoing, we have no doubt that the Commission's construction of section 415 is permissible. Moreover, because the IPPs concede that they were aware of the EUCL charges and believed them to be unlawful when they were assessed, the Commission reasonably found that their cause of action accrued under section 415 when the LECs billed them for the EUCL charges.

Nothing in *Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d 1170 (D.C. Cir. 1975), requires a different result. There, we held that the three-year statute of limitations on contract claims did not bar Hartford Life, the assignee of a promissory note, from bringing suit against the assignor twelve years after the assignment. The delay occurred because Hartford Life had spent many years suing the trustee of the debtor who defaulted on the note—litigation that ended when this court decided that the note was unlawful and unenforceable against the debtor's trustee. Because Hartford Life's cause of action against the assignor "depended upon a prior adjudication of the rights of the trustee" and because it had chosen to pursue its "substantial legal claim" against the trustee rather than suing the assignor immediately, we declined to hold that the "cause of action arose prior to our decision" about the note's validity. *Id.* at 1173–74. Although in *Hartford Life* we cited *Red Chevrolet* for the basic proposition that the "right to sue did not accrue until the plaintiff had a cause of action," *id.* at 1173, our prior ruling that the note was invalid was not mere precedent for Hartford Life's suit against the assignor; instead it established for the first time a predicate fact of injury central to that action. In contrast, although our decision in *C.F. Communications* clarified uncertain precedent, it changed no facts relating to the IPPs' injuries. Moreover, unlike Hartford Life, which had diligently pursued its claim (albeit against the wrong party), the IPPs took no action even though they believed that the LECs were unlawfully assessing EUCL charges.

Finally, the Commission reasonably rejected the IPPs' assertion that it would have been futile to pursue their claims when the injury occurred. As the Commission noted, other IPPs had continuously challenged its approval of EUCL charges, and "pending legal challenges to that [approval] made the legality of the [LECs'] behavior uncertain." *Order*, 17 F.C.C.R. at 24,224, ¶ 53. Although the IPPs contend that they had "no reasonable probability" of successfully challenging the Commission, their probability was exactly the same as those IPPs that did so and succeeded. As the Second Circuit has explained:

> The only sure way to determine whether a suit can be maintained is to try it. The application of the statute of limitations cannot be made to depend upon the constantly shifting state of the law, and a suitor cannot toll or suspend the running of the statute by relying upon the uncertainties of controlling law. It is incumbent upon him to test his right and remedy in the available forums. These suits were not commenced until through the labor of others the way was made clear.

*Fiesel v. Bd. of Educ.*, 675 F.2d 522, 524–25 (2d Cir. 1982) (quoting *Versluis v. Town of Haskell*, 154 F.2d 935, 943 (10th Cir. 1946)) (internal quotation marks omitted).

Alternatively, the IPPs argue that even if their claims accrued when the LECs assessed the EUCL charges, the Commission erred in declining to toll the statute of limitations. While recognizing that section 415 may be equitably tolled, the Commission has construed that provision strictly, even when doing so produces hardship. *See In re Valenti v. AT&T Co.*, 12 F.C.C.R. 2611, 2621–22, ¶ 24 (1997). We too have set a high hurdle for equitable tolling, allowing a statute to be tolled "only in extraordinary and carefully circumscribed instances." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 580 (D.C. Cir. 1998) (internal quotation marks omitted). As the Supreme Court has explained:

> Federal courts have typically extended equitable relief only sparingly. We have allowed equitable

tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing dead-line to pass.

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (footnote omitted). Meant to "ensure[ ] that the plaintiff is not, by dint of circumstances beyond his control, deprived of a reasonable time in which to file suit," *Chung v. DOJ*, 333 F.3d 273, 279 (D.C. Cir. 2003) (internal quotation marks omitted), equitable tolling is unwarranted where a litigant has "failed to exercise due diligence in preserving his legal rights," *Irwin*, 498 U.S. at 96; *see also Smith–Haynie*, 155 F.3d at 580. In light of this stringent test, we have little difficulty sustaining the Commission's refusal to toll the statute of limitations, particularly given our highly deferential standard of review. *See Sprint Communications Co. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996) (explaining that we reverse a Commission ruling that a claim is time barred "only if the agency's decision is not supported by substantial evidence or the agency has made a clear error in judgment").

According to the Commission, the IPPs "did not act with anything approaching due diligence." *Order*, 17 F.C.C.R. at 24,226, ¶ 59. As the Commission explained, even though some IPPs filed complaints early on, they failed to pursue them. Insisting they did act diligently, the IPPs point out that their industry trade association filed a petition in 1989 challenging the EUCL charges on their behalf. *See supra* at 4. But that petition sought only a declaratory ruling that the LECs' imposition of EUCL charges was unlawful, so it could neither have tolled the statute nor otherwise excused the IPPs' failure to pursue complaints for damages, especially when other IPPs did so and thereby preserved their claims in full.

We have reviewed the IPPs' remaining equitable tolling arguments and found them to be without merit. While it is certainly true that the Commission's decision "allows the LECs to keep money that . . . they collected unlawfully," IPP

Pet'rs' Br. at 29, that is both the nature of a statute of limitations and the consequence of the IPPs' failure to file and pursue their complaints in a timely manner.

## IV.

Weary of this long and drawn-out dispute, counsel for the Commission asked at oral argument that we affirm the Commission and put it "out of [its] misery." We are pleased to oblige. As General Douglas MacArthur proclaimed from the deck of the *U.S.S. Missouri*, "[t]hese proceedings are now closed."

*So ordered.*